593 N.W.2d 520 (1999)
459 Mich. 624
In re Sean SOURS, Amanda Sours, Kaytie Sours, Stephen Sours, Chance Sours, and Sammual Sours, Minors.
Family Independence Agency, Petitioner-Appellant,
v.
James Edward Sours and Zellma Louise DeCaire, Respondents-Appellees.
Docket No. 113069, Calendar No. 18.
Supreme Court of Michigan.
Argued March 9, 1999.
Decided May 25, 1999.
*521 Jennifer M. Granholm, Attorney General, Thomas L. Casey, Solicitor General, and Valerie R. White, Chief Assistant Prosecutor, Hillsdale, MI, for petitioner-appellant.
Loomis, Ewert, Parsley, Davis & Gotting, P.C. (by Theresa A. Parker), Lansing, MI, for respondent-appellee Zellma Louise DeCaire.

OPINION
BRICKLEY, J.
In this case, we are asked to review a decision of the Court of Appeals that reversed the probate court's termination of the respondents' parental rights. Because we find that the petitioner satisfied one of the statutory requirements for termination by clear and convincing evidence, we reverse the judgment of the Court of Appeals and reinstate the termination order of the probate court.

I
The respondents, Zellma DeCaire and James Sours, lived together for some time and had six children. On September 28, 1995, before their sixth child was born, Sours struck both DeCaire and their eight-year old son Sean. It is not disputed that Sean was struck accidentally when he put himself between his mother and his father while the two were fighting. DeCaire reported Sours' abuse; although, about a month later, she decided not to cooperate in his prosecution and allowed him to move back into their home.
At this point, the Hillsdale County Family Independence Agency (FIA) petitioned the probate court to take jurisdiction of the couple's five children, alleging "neglect[ ] and refus[al] to provide proper or necessary support," and that their home "is an unfit place for such child[ren] to live in...." MCL 712A.2(b)(1), (2); MSA 27.3178(598.2)(b)(1), (2). The petition was based on Sours' abuse and DeCaire's failure to protect the children from abuse, and sought the probate court's assistance in "ensuring the] cooperation of the parents, and the safety of the Sours children...." This petition did not request that the children be removed from the home. Shortly thereafter, DeCaire, Sours, and the children moved to the city of Coldwater in the adjoining county.[1] The parties dispute whether Sours and DeCaire fled the county with the intent to evade the FIA.
The prosecutor issued a warrant for DeCaire's arrest because of her failure to appear at Sours' abuse trial. DeCaire and Sours separated, and, in September 1996, DeCaire and the children moved in with her uncle in Reading, Michigan, in Hillsdale County.
On September 13, 1996, the Hillsdale prosecutor filed an amended petition, again alleging abuse and failure to protect and asking that the children be removed from the home and placed in foster care. The children were removed between the time this petition was filed and the time a third amended petition was filed on September 23, 1996. The third petition alleged that two of the children had severe diaper rash, and that one was severely malnourished. It also alleged that DeCaire had packed "minimal amounts of clothing" for each child upon removal, and that she had placed "age-inappropriate" candy in their bags for them.
*522 A review hearing was held in the probate court on September 30,1996. In his October 3 post-hearing order, the probate judge found that "the minor children in this cause appear to be abused or neglected...." The order did not specify the basis of this finding. The judge ordered that the children be made temporary wards of the court, that the parents maintain contact with the FIA, that they immediately attend counseling, refrain from substance abuse, and look for work.
On January 15,1997, DeCaire was ordered to show cause why she should not be held in contempt for failing to follow the October 3, 1996, orders of the probate court. On February 6, 1997, the probate judge issued another order that the children remain in foster care, and that DeCaire attend parenting classes, that Sours attend substance abuse counseling, and that they both attend domestic violence counseling. Furthermore, DeCaire was ordered to seek employment and permanent housing, and to stay in contact with her FIA worker. Additional orders to show cause were issued against Sours on February 24, 1997, and DeCaire on April 10, 1997, alleging various failures to comply with the court's orders.
For a time, DeCaire partially complied with the court's orders. DeCaire gave uncontradicted testimony 628 that she obtained two jobs in January or February 1997, and held them until her sixth child was born, in April 1997. She also attended some of the domestic violence and parenting classes that she was ordered to attend.
Sours failed to attend the ordered counseling programs. He was incarcerated in Indiana in March 1996 for shoplifting and for fleeing and eluding the police; he remained in prison through the time of the termination trial. He was released in March 1998, but, in its brief to this Court, the petitioner stated that Sours is now incarcerated in Michiganagain for fleeing and eluding the police. Sours has not made any appearance before this Court.
DeCaire stopped her regular contacts with the FIA when she had her sixth child. The child was born sickly, and DeCaire was instructed to give him medication and keep him on an apnea monitor continuously, in order to assure that he kept breathing. She was also contacted by a home-care nurse who would visit her to answer any questions and to check on the baby's health.
DeCaire testified that she was terrified that the FIA would take this baby away from her, so she attempted to hide his existence from the FIA workers. The FIA was informed of the existence of this child by an anonymous phone call and petitioned to remove the child from DeCaire's home, alleging that she failed to keep the child on the apnea monitor, that she missed a scheduled doctor's appointment for him, and that she failed to give the child proper medication or allow home visits from the nurse assigned to care for the child. When the FIA workers came to take the child, DeCaire attempted to hide him under a blanket on a couch, where he remained without his apnea monitor until the FIA workers found him approximately fifteen minutes later. The court order taking jurisdiction over this baby was entered on August 19,1997.
After the baby was taken from DeCaire on May 8, she became despondent and failed to visit any of her children until September. She testified that she turned to drink and failed to keep in touch with the FIA officials, attend her classes, or work. She failed to attend probate court hearings in her case on May 19 and June 5.
She did, however, take on a new boyfriend, Matt Rowley, in May. In August 1997, DeCaire was involved in a fight between Rowley and his stepfather, in which Rowley pulled her hair. Rowley pleaded guilty of assault. The officer responding to the fight recognized DeCaire, and arrested her on a bench warrant that had been issued by the probate judge because of her nonappearance since May. She was then put in jail for contempt of the earlier court orders, and remained there from August 18 until September 3.
The FIA filed a petition for termination of parental rights on September 25, 1997, alleging that DeCaire and Sours had failed to make progress in their various counseling programs, that Sours had been incarcerated and had no contact with the children, and that DeCaire had become "involved in another abusive relationship in which she was the victim in a criminal complaint."
*523 The petition further alleged that DeCaire had intentionally hidden her youngest child from the FIA, that she had failed to keep a medical appointment for this child, refused visits from a home-care nurse who was assigned to check on him, and had hidden him under a blanket when the FIA workers came to remove him. Furthermore, she had failed to attend probate court hearings on May 19 and June 5, 1997, and had failed to attend a scheduled visitation with her children during this period.
A termination trial was held on November 6 and 14, 1997. On November 14, the probate judge issued findings and an order terminating DeCaire's and Sours' parental rights in the six children. With respect to Sours, the judge found that he failed to attend his ordered counseling and to stay in contact with the FIA. In ruling that the children were reasonably likely to be injured if returned to Sours' custody, the judge cited his criminal background, including three assaults of DeCaire, two of other men, and one stalking of an ex-girlfriend.
With respect to DeCaire, the judge stated that she first came to court "with an extremely uncooperative attitude."
She missed half the parenting classes, didn't go to [abuse counseling] sessions, for victims, which were critical, as a battered partner. She failed to find employment, failed to find a house, failed to separate herself from the perpetrators of this abuse. Wouldn't follow through on the visitation rules.
The judge further found that DeCaire had left the jurisdiction of the court in April of 1997 and did not return until September, almost four months later. He noted that she had failed to give her youngest child his required medication, had not kept him on a sleep monitor, and had hidden him under a blanket, despite his breathing difficulties.
The judge further observed that "[t]he mother now has severed the relationship with Mr. Sours and has taken up plan [sic] to marry a twenty-two year old person, who's not only extremely young, but, also has a problem with alcohol, at least from what the testimony, and also involved in abuse." The judge concluded by stating that "there's been long term neglect and abuse, of the minor children, and it's continued for ten years. And, that there's been no showing of the possibility it stopping [sic]."
In an unpublished, divided opinion, the Court of Appeals reversed this holding, having a "definite and firm conviction that a mistake has been made." The majority found that DeCaire did seek employment, participate in counseling, and seek housing as she was ordered to do, though with some lapses. The majority also noted a lack of medical testimony regarding the alleged malnutrition and the clash of personalities between the lead FIA worker and DeCaire. The Court concluded, quoting the United States Supreme Court's opinion in Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388. 71 L.Ed.2d 599 (1982), "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child[ren] does not evaporate simply because they have not been model parents or have lost temporary custody of their child [ren] to the State."
The dissenting Court of Appeals judge did not find clear error on the part of the probate judge. He based his reasoning on the trial judge's finding that this was a "classic" situation involving an alcoholic and abusive father and a submissive mother. He noted Sours' record of violence and the fact that the family fled to avoid removal of the children. He also noted that DeCaire had packed inappropriate treats and inadequate clothes for the children when they were removed. He noted a physician's diagnosis that one of the younger children was "severely malnourished" and a "failure to thrive" baby. The dissenting judge also relied upon DeCaire's failure to medicate the youngest child and use the required monitor, and the fact that she had hidden the child under a blanket when the FIA workers came to remove him. Furthermore, she disappeared for four months following the removal of her youngest. He noted her new boyfriend and stated that "[j]ust as she had done during her relationship with Sours, she made excuses for the boyfriend's violent behavior and insisted that the children were not at risk." Like the trial judge, he found this to be "ample evidence" of neglect and abuse.
This Court granted leave on December 22, 1998. 459 Mich. 919, 589 N.W.2d 780.

*524 II
The Legislature has set forth specific conditions, at least one of which must be proven before parental rights may be terminated. After a hearing following written notice to the parents, M.C.L. § 712A.19b(2)(c); MSA 27.3178(598.19b)(2)(c), the court may terminate parental rights in the children if it finds any one of the following by clear and convincing evidence:
(b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under either of the following circumstances:
(i) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.
(ii) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.
(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
(i) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the age of the child.
(ii) Other conditions exist that cause the child to come within the jurisdiction of the court, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice, a hearing, and been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the age of the child. [MCL 712A.19b(3); MSA 27.3178(598.19b)(3).]
While there are other possible bases for termination in the statute, they are not relevant in the instant case, because the FIA did not give notice of them to the respondents in the petition for termination.
Probate court decisions terminating parental rights are reviewed for clear error. In re Cornet, 422 Mich. 274, 277-278, 373 N.W.2d 536 (1985). "`To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong...."` People v. Cheatham, 453 Mich. 1, 30, n. 23, 551 N.W.2d 355 (1996), quoting Parts & Electric Motors, Inc. v. Sterling Electric, Inc., 866 F.2d 228, 233 (C.A.7,1988).

A
The FIA initially became involved in this case because of the injury inflicted on the oldest child during an altercation between DeCaire and Sours. Under the statute, the FIA must show that a parent "caused the physical injury or physical or sexual abuse" to the children, or that a parent "had the opportunity to prevent" such injury or abuse and failed to do so. MCL 712A.19b(3)(b)(i), (ii); MSA 27.3178(598.19b) (3)(b)(i), (ii). Furthermore, there must be a "reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home." Id. These showings have not been made in the instant case.
The evidence showed, and the trial judge found, that Sours was no longer involved with DeCaire, as of some eighteen months before the termination hearing. Therefore, DeCaire had protected the children from injury by Sours. Instead, the probate judge relied upon the fact that DeCaire has now "taken up plan [sic] to marry a twenty-two year old person, who's not only extremely young, but, also has a problem with alcohol, at least from what the testimony, and also involved in abuse [sic]." The dissenting Court of Appeals judge stated that "she made excuses for the boyfriend's violent behavior and insisted that the children were not at risk."
As this statute makes clear, not only does the prosecution have the burden of showing by clear and convincing evidence that the parents injured or abused the children, or failed to protect the children from injury or *525 abuse, but the prosecution must also show a "reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent'shome." MCL 712A.19b(3)(b)(i), (ii); MSA 27.3178(598.19b)(3)(b)(i), (ii). It is not disputed, however, that Sours was no longer involved in DeCaire's life at the time of trial, and the only evidence before the probate court that she might expose her children to further risk of abuse was that she was now dating Matt Rowley, who had pleaded guilty of assaulting DeCaire.
The evidence was not contradicted that this assault resulted when DeCaire tried to intervene in a fight between Rowley and his stepfather. No children were present at the time. The petitioner did not dispute that this was the only time that Rowley had been charged with domestic assault, nor did the FIA dispute DeCaire's claim that Rowley was successfully attending violence counseling. An FIA worker investigating the case admitted at trial that Rowley had not been investigated and that the FIA knew nothing about his character or record other than the assault plea.
This record cannot be construed to contain "clear and convincing" evidence of a "reasonable likelihood that the child[ren] will suffer injury or abuse in the foreseeable future if placed in the parent's home." MCL 712A.19b(3)(b)(ii); MSA 27.3178(598.19b)(3)(b)(ii). In contrast, and by way of illumination, it is not contradicted that Sours has been involved in at least five assaultive acts, three of which were domestic assaults. He has failed to attend any domestic violence counseling. He has also been jailed twice during the pendency of this case for fleeing and eluding the police. This behavior, and its apparently habitual character, supports the probate judge's finding of a reasonable likelihood that Sours could injure the children in the foreseeable future were they to be allowed into his household.
It is essentially conjecture, however, to find a "reasonable likelihood" that the children at issue in this case would "suffer injury or abuse in the foreseeable future" if returned to their mother. Therefore, this Court will not sanction termination of her parental rights on this basis.

B
Termination is also appropriate where the children have come within the jurisdiction of the court, and, at a termination hearing at least 182 days later, the court finds that those conditions or other conditions that would bring the child within the jurisdiction of the court are continuing. MCL 712A.19b(3)(c)(i), (ii); MSA 27.3178(598.19b)(3)(c)(i), (ii).
The initial requirement of this subsection is undoubtedly satisfied: On October 3, 1996, both parents were parties to an adjudication in which the probate court took jurisdiction of their children. The question is whether the conditions that led to the adjudication were continuing, or whether other conditions exist that bring the children within the jurisdiction of the court that the parents have failed to rectify after notice and a reasonable opportunity to improve.
The children initially came within the jurisdiction of the court because Sours injured the oldest child and DeCaire failed to protect the children from Sours' abuse. As discussed above, DeCaire had taken steps to protect her children from abuse long before trial by separating herself from Sours. The FIA has not presented clear and convincing evidence that there is a reasonable likelihood that the children will suffer injury or abuse if returned to their mother's home. For these reasons, the conditions that led to the adjudication no longer existed at the time of trial, and it was not proper to terminate DeCaire's parental rights under the first part of this subsection. MCL 712A.19b(3)(c)(i); MSA 27.3178(598.19b)(3)(c)(i).
This does not end our inquiry, however. Under the second part of this subsection, parental rights may be terminated if
[o]ther conditions exist that cause the child to come within the jurisdiction of the court, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice, a hearing, and been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering *526 the age of the child. [MCL 712A.19b(3)(c)(ii); MSA 27.3178(598.19b)(3)(c)(ii).]
The various petitions filed against DeCaire before the termination petition allege neglect in the following particulars: that she failed to provide proper nutrition to the extent that one child was "severely malnourished" and underdeveloped; that she failed to attend to the children's hygiene; that she failed to enroll in and attend her various counseling sessions, and failed to secure housing and a job; that she failed to attend a probate court hearing in her case; and that she did not properly administer medical care to her youngest child, failed to show up for medical appointments for the child or permit a home-care nurse to care for the child.
Because she did not have custody of any of her children after the youngest was removed, after that point, DeCaire's parental fitness could only be judged in other ways: her attendance at court-ordered parenting and abuse classes, her continued contact with her children and FIA workers, her obtaining housing and a job, and her attendance at court hearings regarding her case. But the evidence presented regarding her parenting of the youngest child before his removal, as well as her efforts to mitigate the circumstances that caused the removal of her children, was mixed at best.
She claimed that she had completed or was completing the required parenting and abuse classes and that she had found a home that was almost ready for occupancy at the time of trial. She claimed that she had secured a job pending passing a drug test. The FIA's witnesses at trial did not contradict her claims about almost having obtained housing and a job. They did, however, dispute her claims regarding her attendance at and participation in parenting and domestic violence classes.
In addition, there was testimony that DeCaire failed to meet many basic parenting responsibilities, as well as those responsibilities required of her by the court and the FIA. In a number of significant ways, she did not properly care for her youngest child: she failed to keep a medical appointment, utilize the services of a home-care nurse, and properly medicate the child or use the required apnea monitor.[2] She hid the sickly child under a blanket for fifteen minutes without the apnea monitor attached. Most significantly, after the removal of her youngest, she admitted not making any contact with her children, the FIA, or the court from May until August or September of 1997, and stated that she "turned to alcohol" during this period.[3]
This evidence is sufficient to support the probate judge's finding of neglect under the statute. MCL 712A.19b(3)(c)(ii); MSA 27.3178(598.19b)(3)(c)(ii). DeCaire had been put on notice in two separate petitions, dated September 23, 1996, and May 7, 1997, that she had neglected her children in a number of particular ways. After court hearings on October 3, 1996, and February 6, 1997, she had been ordered to stay in contact with the FIA workers and attend parenting classes that would have helped her rectify this continuing neglect.
The probate judge specifically found, however, that she had neglected and endangered her youngest child by failing to attend to his medical care and by hiding him under a blanket while knowing about his breathing difficulties. DeCaire failed to attend two probate court hearings regarding whether this ongoing neglect had been rectified.
*527 Thus, it is clear that DeCaire failed to ameliorate her neglect of her children, despite a reasonable opportunity to do so after she had received notice of the problem and been afforded hearings regarding it. Indeed, after her youngest was removed, DeCaire's failure to mitigate her neglect worsened into outright abandonment. She made no contact with the court, the FIA, or her children until four months later when she was returned to the court pursuant to a bench warrant.
The probate judge found that DeCaire had been given notice, repeatedly, of the programs she would have to participate in and the changes that she would have to make in order to have her children returned to her. He found that she had neglected to properly care for her youngest child and then disappeared for four months. The court concluded that "there's been long term neglect and abuse, of the minor children, and it's continued for ten years. And ... there's been no showing of the possibility [of] it stopping."[4] These findings, supported by clear and convincing evidence in the record, are sufficient to sustain an order of termination under M.C.L. § 712A.19b(3)(c)(ii); MSA 27.3178(598.19b)(3)(c)(ii).

III
Because we hold that at least one of the statutory bases for termination is supported in the record by clear and convincing evidence regarding each of the respondents, we reverse the judgment of the Court of Appeals, and reinstate the probate court's termination of the respondents' parental rights.
WEAVER, C.J., and TAYLOR, CORRIGAN, and YOUNG, JJ., concur with BRICKLEY, J.
MICHAEL F. CAVANAGH, J. (concuring in part and dissenting in part).
While I concur with the majority's conclusion in part II(A) of its opinion, I must dissent from the remainder of the Court's holding. I fear the Court of Appeals correctly acted to remedy a serious injustice wrought by the probate court's decision, and cannot join in this Court's reversal of such action and its affirmance of the termination of the mother's parental rights.

I
As the majority correctly notes, our review of this matter is for clear error. In re Cornet, 422 Mich. 274, 277, 373 N.W.2d 536 (1985). Where the probate court found the facts sufficient to support a termination of parental rights, we begin our review with the facts before that court.
The relevant history in this matter begins when appellees Zellma "Lisa" DeCaire and James Sours (not appearing before us) were cohabitating as long-term domestic partners. On September 28, 1995, the two became involved in an altercation. At that time the parties had five children, who were living with them. When Mr. Sours began striking Ms. DeCaire, their oldest son, Sean, an eight-year-old, came to his mother's defense and was accidentally struck by Mr. Sours. Ms. DeCaire used the distraction to find a telephone and call the Hillsdale County Sheriff. Mr. Sours was later arrested.
Subsequently, Ms. DeCaire notified the prosecutor that she had no intention to testify against Mr. Sours. Shortly thereafter, the Family Independence Agency (FIA) petitioned the Hillsdale County Probate Court to take jurisdiction of the children pursuant to M.C.L. § 712A.2(b)(1), (2); MSA 27.3178(598.2)(b)(1), (2). The grounds cited were physical abuse by Mr. Sours and failure to protect the children on the part of Ms. DeCaire. The petition, filed on October 30, 1995, did not request removal of the children. The parties dispute whether a hearing was scheduled, and Ms. DeCaire claims to have arrived at court for one, only to find it had been canceled. The docket for this case shows no entries in 1995.
Ms. DeCaire claims that, while at the courthouse for the canceled hearing, she *528 spoke with an FIA worker who informally told her that she should not let Mr. Sours back into the house. Ms. DeCaire denies, however, being notified of a new hearing date. Shortly thereafter, Ms. DeCaire permitted Mr. Sours to return to the home, and the family moved to Coldwater, approximately fifteen miles from their former residence and across the county line into Branch County. The prosecutor argues that Ms. DeCaire fled the jurisdiction.[1]
Apparently unbeknownst to Ms. DeCaire, however, she was indeed a fugitive from justice, resulting from her failure to testify against Mr. Sours. Despite the fact that she had made it clear that she had no enthusiasm for the prosecution of Mr. Sours for the assault on her and her son, the prosecutor nonetheless expected her to appear as a witness at the November 1995 trial. When she did not, the prosecutor issued a warrant for her arrest for failure to appear. The prosecutor has not offered any evidence to indicate that Ms. DeCaire was aware of this warrant.
The relationship between the parties apparently did not improve much in Coldwater. They separated shortly after relocating, and Mr. Sours moved on. In September 1996, Ms. DeCaire took the children and returned to a home owned by her uncle in Reading, Michigan, in Hillsdale County. It should be noted that the parties separated almost a year before the subsequent petition for termination of rights that purported to be based on Ms. DeCaire's failure to protect the children from Mr. Sours.
Ms. DeCaire enrolled her children in the Reading school district, and the FIA soon discovered their location. On September 13, 1996, the prosecutor filed a petition for removal of the children from the parents' custody, which the probate court granted.[2] This order once again purported to cite a failure to protect the children on the part of Ms. DeCaire as the downfall necessitating termination of her parental rights. Both the probate court and the FIA failed to acknowledge that Mr. Sours, the person from whom the children needed protecting, had been out of the family home for almost a year.
An FIA worker, Kelli Todoroff, arrived to remove the children from Ms. DeCaire. Ms. Todoroff told Ms. DeCaire to pack "some things." Ms. DeCaire packed a few outfits for each child, apparently not realizing that they would be gone for a very long time. She also packed some candy for each child. The FIA would include in later filings criticism for Ms. DeCaire for packing only minimal clothing and for giving inappropriate snacks. Ms. Todoroff's testimony would seem to indicate that the children were not enthused about being taken from their mother.
Mr. Sours remained out of the house and the children's lives, appearing at Ms. DeCaire's residence on occasion to do odd jobs. The FIA, while criticizing this contact, did not show that there was any substantial contact or relationship taking place between Ms. DeCaire and Mr. Sours. In fact, as will be seen below, the opposite was true, as both parties were moving on to new relationships.
In its petition for termination, the FIA complained that DeCaire continued to see James Sours "and allows him back in the home." That would have been a rather difficult accomplishment, because Mr. Sours had been recently incarcerated for six months, and, at the time of the drafting of this petition, had in fact been married to another woman for approximately two months. Ms. DeCaire also had acquired a new boyfriend, Mr. Rowley. Also found among the FIA's charges against Ms. DeCaire is a criticism that upon removal two of the children had diaper rash. While counsel for Ms. DeCaire devotes approximately one page of her brief to the undisputed notion that diaper rash *529 affects children across all economic, social, and geographic boundaries, I would suggest that it is a well-known fact of child rearing, and is more probative of the FIA's apparent willingness to find signs of neglect in the most innocuous circumstances than it is of Ms. DeCaire's fitness as a parent.
The most serious allegation that the FIA leveled against Ms. DeCaire was that the children were medically uncared for and ill-treated. There were general allegations that the children were small and below average height and weight. It would seem that several of the children were born early, and this might be expected. The other, more serious, charge was that Chance, at that time the youngest child, was a "failure to thrive" baby and severely malnourished. Both "failure to thrive" and "malnourishment" are, of course, medical diagnoses. One might expect that there would have been medical testimony to support them. In this case, however, that would be incorrect.
Ms. Todoroff, the FIA worker, provided the only medical testimony involved on these issues. Because the Rules of Evidence do not strictly apply to termination hearings, she was able to offer the rank hearsay that a doctor had told her this information. She did not offer any medical reports, nor did the physician testify. Counsel for Ms. DeCaire attempted to cross-examine Ms.Todoroff on the issue of the "failure to thrive" diagnosis, and was met with a response by Ms. Todoroff that "I don't know, I'm not a doctor."[3]
Upon the court taking jurisdiction of the children, Ms. DeCaire was ordered to attend Domestic Harmony (a domestic violence counseling center) and parenting classes and to obtain housing and employment.
Once she was released from her jail sentence for failure to appear at Mr. Sours' trial, it appears as though Ms. DeCaire made some efforts in this regard. The Court of Appeals found, and Mr. Yoder, the chief FIA worker (who, from his testimony, appeared to hold no high regard for Ms. DeCaire) testified that she attended all the parenting classes except the "good-bye session," which was not a substantive class. She appears to have infrequently attended Domestic Harmony,[4] and appeared to search for a house.
Perhaps the most vigorous dispute, however, concerns her search for employment. Ms. DeCaire admitted at a show-cause hearing on February 6, 1997, that she at times did not always submit the weekly proof of employment slips as required by the court. She did, however, obtain two jobs in December 1996 or January 1997, one at an Amoco station in Coldwater and the other at Baker's Street Truck Stop in Angola, Indiana. She maintained employment at these two establishments until April 6, 1997, when she gave birth to her youngest son, Sammual.[5] At this February hearing, Ms. DeCaire also admitted that she had not been diligent in attending her Domestic Harmony counseling.
Ms. DeCaire had not informed the FIA of her pregnancy.[6] Sammual was born prematurely on April 6, 1997. He failed to gain weight and was taken by Ms. DeCaire to a hospital in Ft. Wayne, Indiana, on April 8. He remained hospitalized for approximately three weeks. Because of episodes where Sammual would appear to have trouble breathing and his heart rate would drop, he was placed on an apnea monitor and given various medications.[7]" Between the hospitalization *530 of Sammual and the trips to Ft. Wayne, Ms. DeCaire apparently missed enough work to get fired from both jobs.
In early May 1997, the FIA discovered that Ms. DeCaire had given birth to Sammual. On May 7, 1997, a removal order was entered (apparently ex parte). On May 8, 1997, FIA workers went to the home where Ms. DeCaire was residing and forcibly removed the child. Upon arrival of the FIA workers, Ms. DeCaire attempted to hide the child under a heavy blanket. The prosecution, both below and in this Court, seems to have implicitly accused her of nearly suffocating the child, despite a complete dearth of evidence regarding the effects of this episode on the child.[8] It does appear that Ms. DeCaire made every effort (including this most inappropriate one) to hide Sammual from the FIA.
The allegations offered supporting the removal of Sammual included details of his various medical problems and the blanket incident. There was no evidence offered, however, that his medical problems were in any way Ms. DeCaire's fault, and it would appear that she appropriately took him to see a specialist at the more advanced children's hospital in Ft. Wayne, as opposed to the local community hospital. Ms. DeCaire is faulted by the FIA for not working with a Dr. Chen and not allowing a home health care nurse to visit. While there is evidence that a relative of Ms. DeCaire did abruptly cut off a home health aide who telephoned the residence and wanted to visit, Dr. Chen was not heard from, and hence there was no competent testimony that Ms. DeCaire did not cooperate with him.
Ms. DeCaire is also cited and faulted for not having the child on the apnea monitor when the FIA arrived. An FIA worker, Charles Raciboski, was allowed to testify regarding the medical diagnosis and treatment regarding the apnea monitor. He testified that the child was supposed to be on the apnea monitor at all times. Cross-examination brought out that he was never told this by Dr. Chen or any other medical authority. Mr. Raciboski responded that he believed the child was required to be on the monitor at all times because that is what doctors "normally want."[9] While the prosecutor did call one medical authority, a nurse, Judy Knowles, who testified by telephone, did not offer testimony that Sammual had to be on an apnea monitor when Ms. DeCaire held him.
Mr. Raciboski also alleged that Ms. DeCaire failed to have the required medicine present at the time of the FIA's removal of Sammual. There was no evidence supporting this assertion offered at trial, and Mr. Raciboski admitted at trial that when he asked about the medication, Ms. DeCaire showed him some of the syringes and attempted to explain what they were for. Mr. Raciboski did not find this explanation adequate or to his satisfaction, thus, he "did not investigate further."
After Sammual was seized by the FIA, Ms. DeCaire apparently became quite depressed and suffered an emotional breakdown. She admits that she began abusing alcohol and *531 essentially dropped out of circulation for approximately three months.
A bench warrant was issued for Ms. DeCaire's arrest, and she spent thirty days in jail following her arrest. Upon release and before the filing of the termination petition, she again attempted to comply with the FIA's demands. She began attending Domestic Harmony again, and also began visiting the children on a regular basis (she had not visited them regularly during the three months in which she abused alcohol and suffered from depression). By this point, the FIA had filed a petition for termination of parental rights.
Ms. DeCaire also purchased a mobile home, and offered evidence that it would be habitable and up to standards within four weeks of the time of the termination hearing. The FIA argues that she should have done this much sooner and that she did not show that she had obtained a permit to move the trailer. Ms. DeCaire also offered evidence of her attendance at Domestic Harmony, her lack of contact with Mr. Sours, her completion of all assigned substantive parenting classes and her return to job searching.
Testimony about all these events was offered at the termination trial. The last relevant piece of testimony was that offered by Ms. DeCaire regarding her final visitation with the children. At that time, the day before the trial, Mr. Yoder, according to Ms. DeCaire, told her to enjoy her visit because it probably would be the last one she would have.[10]
On November 14, 1997, the probate court entered an order terminating the parental rights of DeCaire and Sours. On August 25, 1998, the Court of Appeals reversed and remanded only for purposes of "entry of an order of disposition placing the children in the custody of their natural mother." Unpublished opinion per curiam (Docket No. 208203). Counsel for Ms. DeCaire motioned for the Court of Appeals to give the judgment immediate effect. The prosecution asked that visitation with DeCaire be stayed, pending resolution of the matter by this Court. The Court of Appeals entered an order granting immediate effect, and the prosecution filed for leave to appeal before this Court.

II
Respondent-appellee Mr. Sours has not appeared before this Court, and this Court permitted counsel for him to withdraw on the basis of a lack of contact with him. It would appear that Mr. Sours has elected to abandon his appeal before this Court, and, in view of his history of violence and utter failure to put forth any effort from the time the probate court asserted jurisdiction over the children, I cannot conclude that the probate court erred in terminating Mr. Sours' parental rights to these children. Accordingly, I would affirm that determination.

III
Likewise, I agree with the majority that the termination of parental rights of Ms. DeCaire cannot be sanctioned on the grounds originally pleaded in the FIA's complaint. The evidence indicates that Mr. Sours has long since left the children's lives, and any attempt to graft the allegations regarding Mr. Sours onto Ms. DeCaire's subsequent relationship with Mr. Rowley would simply amount to, as the majority correctly notes, conjecture.

IV
In support of its final holding affirming termination, the majority relies on M.C.L. § 712A.19b(3)(c)(ii); "MSA 27.3178(598.19b)(3)(c)(ii) in finding that other conditions that could have caused the child to come within the jurisdiction of the court existed and that Ms. DeCaire had failed to rectify those conditions after notice. Specifically, the majority focuses on the allegations *532 that one child was "severely malnourished" and underdeveloped, that Ms. DeCaire failed to attend to the children's hygiene, that she failed to attend various counseling sessions, that she failed to secure housing and a job, and that she failed to attend the court hearing, and allegations regarding her failure to properly administer medical care to her youngest child.
Of these, I can find no testimony that would indicate that the allegations regarding the children's hygiene were proven, and the testimony regarding her attendance at various counseling sessions, her securing housing, and her employment, would not support a finding of a complete failure in any of these areas. Rather, it would appear that Ms. DeCaire made serious efforts in all three, in that, while her efforts were neither entirely consistent nor wholly successful, they were in no way failures sufficient to result in the termination of her parental rights. Additionally, these allegations relate, in regard to the children, only to general matters. While it is, of course, preferable, having or retaining employment is by no means a prerequisite to being an able parent. Likewise, while Ms. DeCaire experienced some difficulty in obtaining housing, but also found some apparent partial success, there is no allegation that the children's shelter needs were not being met. Rather, Ms. DeCaire was relying on her relatives for assistance in this matter. Indeed, of all these allegations, the relationship or detriment to the children from Ms. DeCaire's failings was, at most, minimal.
There are, however, two different allegations that relate to the children's health and well-being. The first is that Ms. DeCaire failed to provide proper nutrition to the extent that one child was "severely malnourished" and underdeveloped. This is, quite obviously, a serious allegation. There was, however, no medical testimony offered that would support a finding that a child was severely malnourished. Rather, the FIA offered an assertion of one of its case workers that a physician had told her that a child was severely malnourished. The record indicates that several of Ms. DeCaire's children were born prematurely, and thus were correspondingly smaller for their age than would be children who experienced a fullterm delivery. Given this, and given the absence of any testimony from a competent medical professional that a child was severely malnourished or otherwise underdeveloped in some way related to neglect, as opposed to premature birth, I am left with the conviction that the probate court clearly erred in finding so, and that the majority likewise errs in relying on it.
In regard to the malnutrition and "failure to thrive," the only evidence regarding this was the condition of the child Chance, who was diagnosed as a "failure to thrive" baby by an FIA caseworker, Ms. Todoroff. There is no indication in the record that this caseworker had any medical training. Indeed, when asked on cross-examination about the specifics of this condition and what criteria qualified Chance to be diagnosed with such a condition, the worker replied that she was not a doctor. Apparently this worker was able to utilize labels and diagnoses, just not understand them. It is difficult to discern how such a witness could be considered competent, or how such testimony could form a basis for the majority's reliance.
Indeed, the lack of diligence of the probate court in fact finding is evidenced by its finding that there was evidence of a pattern over ten years of neglect regarding these children. As the majority admits in the margin, at the time the probate court made this statement, no child of Ms. DeCaire's had reached ten years of age. While the majority dismisses this as a minor error, I fear that this, when viewed along with the record as a whole, indicates a greater failing on the part of the trial court. The probate court appears to have based a large portion of its decision on generalities, as opposed to the specific facts of this case. Nowhere is this more evident than in the probate court's finding that Ms. DeCaire had been a neglectful mother, even before she became a parent.
Likewise, the evidence that Ms. DeCaire neglected Sammual's health is clearly lacking. The only evidence that would appear to support such a finding is the testimony that a relative of Ms. DeCaire, not Ms. DeCaire herself, turned away an attempt by a home health care nurse to schedule a visit.[11] As to *533 the actions of Ms. DeCaire personally, there is evidence that, when her child was born prematurely and with medical problems, she sought appropriate treatment at a specialized hospital. There is evidence that an apnea monitor and various medicines were prescribed. There is the unsupported assertions of the FIA case worker that the apnea monitor was not being used properly and that the medicines were not being given properly. That caseworker's testimony, however, indicated that he had no particular knowledge of the apnea monitor or the instructions given to Ms. DeCaire regarding it, and, likewise, that he had failed to undertake any investigation regarding whether Ms. DeCaire was administering the medicines properly (or even any investigation regarding what the proper dosage and the administration would have been).
As the Court of Appeals correctly noted, "The fundamental liberty interest of natural parents in the care, custody, and management of their child[ren] does not evaporate simply because they have not been model parents or have lost temporary custody of their child[ren] to the State." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). In attempting to terminate the rights resultant from this fundamental liberty interest, the FIA and the prosecutor attempted to meet their burden of proof by offering only unsubstantiated allegations, which the trial judge accepted without question. In doing so, the prosecution offered, and the trial judge accepted, testimony that clearly (and by its own declarance admittedly) was incompetent. Thus, the trial judge's decision is based on little more than a "house of cards" that, when examined closely for any time, readily collapses. I am, thus, left with the definite and firm conviction required under In re Miller, 433 Mich. 331, 337, 445 N.W.2d 161 (1989), that the probate court erred in terminating the parental rights of Ms. DeCaire on this basis.
An FIA investigator in this case testified that "childhood is short." Indeed it is, and thus we empower the FIA and the probate court to undertake dramatic efforts to ensure that children are protected. It would appear, however, that, on occasion, such substantial empowerments can lead to substantial errors. I fear that is the case here. As the Court of Appeals noted, it is quite likely that Ms. DeCaire and the FIA had substantial "attitude" or "personality" conflicts. We must expect, and endeavor to require, that the professionals charged with the protection of children rise above such matters. There is every indication in the record that that is not what happened here. Rather, a mechanism designed to protect children was utilized as a mechanism that, early on, seemed destined toward a predetermined resultthe termination of Ms. DeCaire's parental rights. The reasons offered in the record clearly fall far short of what is necessary to support such termination. Indeed, on the basis of this record, one is left to wonder not only what the trial judge found as a basis for his decision, but what motivated the FIA to continue this matter for so long.[12]
There is every indication that Ms. DeCaire is not a perfect mother, or even an exceptional one. But the record demonstrates that she is a parent who is striving to improve her situation. When given tasks, she made substantial efforts to comply with them. When her child was ill, she sought treatment at an appropriate hospital and cared for him throughout the period of his illness, even at the cost of her employment. Termination of parental rights is perhaps the most serious matter that our probate judges have been called upon to hear. Such a decision cannot be based on mere rudimentary investigations or unsupported allegations and suppositions about medical and technical matters beyond the expertise of the witnesses and the court. There is every indication here that the probate court's decision *534 was lacking in both the level of care necessary to make such a decision, and the evidence required to support it.
Given the great difficulty inherent in such matters and the fact-laden nature of such disputes, it is only with great trepidation that appellate judges tread into such waters and differ with the trial court. Miller, supra at 337-338, 445 N.W.2d 161. This is recognized in our extraordinarily high standard of review, that of clear error and the need of a definite and firm conviction of a mistake. It is without question that a review of the evidence, record, and argument of the parties herein leaves me with such a conviction. I would affirm the decision of the Court of Appeals in reversing the probate judge's ruling, having a definite and firm conviction that the trial court erred in terminating Ms. DeCaire's rights, and a further conviction that such an error brings a substantial injustice on both Ms. DeCaire and the children the probate court purportedly acted to protect.
MARILYN J. KELLY, J., concurs with MICHAEL F. CAVANAGH, J.
NOTES
[1] An FIA worker stated that an order for removal was obtained by the FIA on November 3, 1995. There is no indication of this on the probate court docket, however, nor is a copy of this order a part of the record.
[2] While much of the admitted evidence regarding use of medications and the apnea monitor was hearsay, the attorney for the respondent failed to lodge an objection to the admission of this evidence. We further note that the nurse who discharged the respondent's baby from the hospital gave competent testimony at trial that the apnea monitor was to be on the baby "continuously."
[3] Had it been pleaded in the petition for termination, DeCaire's disappearance between May and August of 1997 would constitute an independent ground for termination pursuant to M.C.L. § 712A.19b(3)(a)(ii); MSA 27.3178(598.19b)(3)(a)(ii). The fact that abandonment was not pleaded as an independent ground for termination does not mean, however, that the probate judge may not rely on the abandonment as evidence of ongoing neglect under M.C.L. § 712A.19b(3)(c)(ii); MSA 27.3178(598.19b)(3)(c)(ii). Indeed, where the other requirements of this subsection are satisfied, such evidence is highly probative of an inability or unwillingness to properly care for the children in question.
[4] The factual finding that the "neglect and abuse" had continued for "ten years" is clearly erroneous on the basis of the record. The oldest child was only nine years old at the time of the trial, and no evidence was submitted of neglect or abuse before this child's injury at the hands of his father on September 28, 1995, a little more than two years before the trial. This error does not, however, alter our conclusion that petitioner adduced sufficient evidence of neglect to satisfy the statutory requirements for termination. Thus, this Court will not disturb the probate court's ruling, though it was partially based on an erroneous finding of fact.
[1] A person who gets on a plane in the midst of a Michigan winter and flies to Florida, could be said to have fled the snow. The simpler answer, of course, is that the person merely took a vacation. The prosecutor attempts to characterize what appears to be a simple move (possibly for economic reasons) as a flight to avoid prosecution. There is no record evidence that Ms. DeCaire was informed of a court hearing regarding the FIA case, and there has been no evidence to indicate that she "fled" any sort of case. Had she done so, one might logically think that even half a tank of gas in almost any vehicle would carry her flight farther than fifteen miles.
[2] Again, note that in reality the children were only in the custody of Ms. DeCaire, Mr. Sours having long since moved on.
[3] While it is the province of the trial judge to determine matters of credibility, as a separate matter, it would seem rather clear that Ms. Todoroff was herself incompetent to offer any sort of testimony regarding Chance's medical conditions. Indeed, she admitted as much.
[4] It must again be noted that the relationship that precipitated the referral to this domestic violence program had itself been terminated for over a year before the court included this referral in its order.
[5] At one point, when the FIA was attempting to contact Ms. DeCaire, an agency worker called the Amoco station; so it would seem that the FIA could not accurately dispute knowledge of her employment.
[6] There was some testimony that Ms. DeCaire had, during a medical visit to the hospital, met a young woman whose infant had just been seized by the FIA. Ms. DeCaire testified that this incident frightened her.
[7] An apnea monitor is attached to a child and sounds an alarm when it detects a drop in a child's respiratory or cardiac rate below a certain level. See Infantile Apnea and Home Monitoring, 6 NIH Consensus Statement, October 1,1986, pp. 1-10. The idea is to prevent sudden infant death syndrome (SIDS). Given that the cause of SIDS is unknown, medical science is not certain if this works, and the area is not without considerable controversy. Id. The monitor is designed to sound an alarm if it detects certain conditions in unattended children that should cause the parents to immediately pick up the child. This is believed to prevent any further drop in the respiratory or heart rate. Neither the prosecutor nor the FIA favored the trier of fact with any medical or technical testimony regarding this device, and the FIA worker who did refer to it appears to have been both unqualified to testify regarding the device and to have been laboring under a factual misimpression concerning it.
[8] This is not, however, intended to in any way minimize the seriousness of this episode. While the majority of the FIA's assertions appear ill-grounded, unproven, or both, this incident did show a serious disregard of the child's needs and health, one which can be understood, but by no means excused, in light of Ms. DeCaire's apparent fear of the FIA and the existence of an arguable basis for such fear. It has not been suggested by the majority, however, that this incident, standing alone, could form a basis for termination.
[9] Given the prosecution's failure to offer any competent or expert testimony regarding the monitor, there is no record support to refute Mr. Raciboski's version of the proper operation of this device. The body of medical literature would seem to disagree with his view, however. See NIH Consensus Statement, n. 7 supra.
[10] Not mentioned above are the remaining, even more trivial, allegations leveled by the FIA that Ms. DeCaire spent an inappropriate amount of time with Chance during her visitations and gave unapproved gifts to the children during her other visits. Ms. DeCaire testified that at this time Chance was an infant and that she carried the child around with her while she visited with the other children, as one might expect. The gift allegation apparently resulted from a birthday one of the children had about the time of one of her visitations. She testified that she brought the child a birthday gift and, in keeping with a family tradition, about which others testified, delivered each child a gift, so no one would feel left out.
[11] Arguably, the blanket incident could be construed in this regard, though, standing alone, neither I, nor, apparently the probate court or the majority, would find this isolated incident sufficiently egregious to support a termination of Ms. DeCaire's parental rights.
[12] It may well be that the FIA simply failed to investigate the changes and circumstances after Mr. Sours' departure, and continued blindly on the initial course toward termination. Given that the FIA appears to have recognized Mr. Sours' absence only very late in the proceedings, this is not implausible.