*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* A. MIELKE, Minor.

UNPUBLISHED
September 15, 2022

No. 360839
Berrien Circuit Court
Family Division
LC No. 2019-000054-NA

Before: MURRAY, P.J., and O'BRIEN and REDFORD, JJ.

PER CURIAM.

Respondent-father appeals as of right the trial court's order terminating his parental rights to his youngest child, AM.[1]  On appeal, respondent argues that the trial court erred because termination did not serve AM's best interests since he had sufficient parenting ability, his rights to AM's siblings were not terminated, AM would not be easily adopted, and the bond between him and AM declined only because of the suspension of his parenting time.  We affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Two days after AM's birth, petitioner, the Department of Health and Human Services (DHHS), petitioned the trial court to take custody of AM.  Two companion cases, which are not part of this appeal, were already open regarding three of respondent's other children, JM, CM, and SM.  The trial court authorized the petition, placed AM in foster care, and ordered frequent parenting time, either supervised or unsupervised, at DHHS's discretion.

Throughout the case, respondent needed to complete and benefit from various parenting-skills classes, individual counseling, an updated psychological assessment, and a parenting assessment. These services were intended to help respondent address what emerged as his primary barriers to reunification with AM: parenting skills and emotional instability.  Although respondent started several of these services, after some time, he began to refuse them.  At one point, respondent also expressed that he had no interest or intention of being a full-time parent.

---

[1] AM's mother is not a party to this appeal.

Meanwhile, concerns about AM's medical and mental-health conditions also emerged. Although AM was doing well in foster care and bonded with the foster parents, they began to have concerns about AM's day-to-day needs. It became apparent that AM clearly had different needs than an average child. AM was eventually diagnosed with a sensory processing disorder as well as some emotional regulation delays. She required a very structured routine, very predictable caregivers, and other, very specific care. AM faced a possible autism diagnosis, but a formal diagnosis could not be made until AM became at least three years old. In addition, AM was diagnosed with an unspecified genetic disorder and she had dietary allergies and restrictions, environmental allergies, asthma, eczema, speech delays, and sensory processing delays. These issues presented "everyday, ongoing concerns" for AM.

An infant mental-health professional stated that once parenting visits resumed after a delay caused by COVID-19, AM began expressing anger and frustration through headbanging at parenting visits. AM continued to exhibit headbanging behavior for a few days after contact with either of her parents. As a result of the distress that parenting-time visits caused AM, the infant mental-health professional felt that the visits were actually detrimental to AM's mental well-being and recommended that they be suspended until AM's parents engaged in further services to learn about AM's needs and how to positively interact with her in light of those needs.

The caseworker recommended that respondent attend supportive visitation with AM. Because respondent also needed to "get past his own issues of instability, outbursts, the mood swings" to address parenting time and ensure such were appropriate, counseling and an updated psychological assessment were requested. An infant mental-health professional offered to work with respondent to be more responsive to AM and he started the sessions but eventually refused to participate in any additional services later resulting in the suspension of parenting time because the visits were demonstratively damaging to AM emotionally and psychologically. Further, respondent continually failed to listen and actually implement the infant mental-health provider's directions. The trial court noted that respondent failed to complete and benefit from services, and failed to learn how to safely and appropriately interact with AM given her special needs.

The caseworker acknowledged that respondent had no parenting time with AM for about a year, partly because of AM's severe dysregulation and because unstable moods by a caregiver "would be extremely destructive to this child." The caseworker stated that when she tried to explain AM's needs to respondent, he refused to let her inform him, and he

> made no indication that he is willing to even begin to understand the needs of this child. He refuses to participate in services. He refuses to even speak with me and this has been a pattern throughout the year that I've had the case. And at this point I see no—no indication that he would make any type of change to make this child ever be safe in his care.

Respondent argued that he would have participated in the services if he had been allowed to see AM. He blamed DHHS for creating the situation in which little bond between AM and her parents remained, and he asserted that DHHS simply attempted to destroy the bond completely by delaying further parenting time. That prompted the trial court to order parenting time to continue "in a therapeutic setting by Zoom" for 30 days, with the goal to return to in-person visits. The trial court emphasized the importance of continuing the parenting time, saying: "The parenting time

concerns me. I don't want that to be stopped. But I want to make sure that it's safe. And then I want to make sure that the parents understand what they need to do here and we get it done."

As the case continued, the trial court admonished respondent to get more involved, to work with the caseworkers and counselors regarding his frustration levels during visits, and to "take advantage of all the parenting time you have here cause that's the only way we're gonna solve the case." Respondent, however, continued to not participate, and a caseworker believed that he even blocked her phone number. AM's lawyer-guardian ad litem argued that respondent's only participation had been to show up and yell, "[G]ive me my kid back." Respondent stated that he did not believe that he needed additional parenting skills in order to raise AM. When asked if he felt that his emotions were too far out of control to care for AM, father replied: "I'm out of control because this has gone nowhere in two and a half years. And then they keep making it worse and it's like . . . a big circus."

Petitioner argued that the trial court should terminate respondent's parental rights because the issues of emotional instability and parenting skills had not been rectified. The caseworker noted that she contacted AM's family members, but they were unable to care for AM and were unwilling to take on guardianship of her. AM's foster parent was also unwilling to provide guardianship under the circumstances.

The trial court found that clear and convincing evidence established three statutory grounds for removal: MCL 712A.19b(3)(c)(*i*) ("The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age"); MCL 712A.19b(3)(g) ("The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age"); and MCL 712A.19b(3)(j) ("There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent"). The trial court stated that despite respondent being offered "very extensive services including psychological services, parenting skills services, specialized one-on-one parenting skills services, and other services to stabilize his life" he failed to complete or benefit from them enough to have AM placed with him, did not cooperate or communicate with DHHS throughout the case, and remained "no closer to reunifying with his child than at the start of the case." The trial court noted that respondent simply refused to make the necessary life changes to be able to properly care for AM. Respondent's continued refusal to engage in services indicated to the court that he "would never be able to overcome any of these concerns preventing reunification in the near term, long term, if ever in his or the child's life."

Regarding AM's best interests, the trial court found that evidence established that AM needed the stability of a parent who was "able to provide daily involvement in [her] life and create a stable home," and that AM had special needs, physically, mentally, and emotionally, that respondent simply could not provide. The trial court also found that respondent could not "control his own emotions and psychological needs to where he can provide a safe, stable, and emotionally calm environment for his child." Further, AM, like all children, needed "love, support, maintenance, supervision, and ability by their parent to meet their most basic needs." The court found that AM required permanency, consistency, stability, a stress-free and calming home, and a caregiver who could assist with her "very real physical, emotional, and psychological needs

-3-

beyond those of most children," which respondent did not take the opportunity to learn how to provide. As a result, the court found that respondent "is incapable of providing this child with a caring, stable environment." The trial court also found that respondent had a "minimally bonded relationship with the child but none that would prevent termination." Overall, the trial court found that the statutory grounds were met by clear and convincing evidence and that termination served AM's best interests.

## II. ANALYSIS

On appeal, respondent argues that the trial court clearly erred when it found that termination of his parental rights served AM's best interests. He contends that (1) the bond between AM and him diminished because the trial court suspended his parenting time, (2) AM will be fatherless and suffer the most if his rights remain terminated, and (3) it made very little sense to terminate his rights to AM because mother's rights to AM were not terminated and respondent's rights to his other children, CM and SM, were not terminated.

We review for clear error a trial court's factual findings. *In re Gonzales/Martinez*, 310 Mich App 426, 430; 871 NW2d 868 (2015). A trial court's finding is clearly erroneous if we are left with a definite and firm conviction that a mistake was made. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). Such a mistake must be more than "maybe or probably wrong" to be clearly erroneous. *In re Sours*, 459 Mich 624, 633; 593 NW2d 520 (1999).

In this case, respondent does not argue that the trial court erred when it found by clear and convincing evidence that one or more statutory grounds existed to terminate his parental rights. As such, we may presume that the trial court did not clearly err by finding that the unchallenged statutory grounds were established by clear and convincing evidence. *In re JS & SM*, 231 Mich App 92, 98-99; 585 NW2d 326 (1998), overruled in part on other grounds *In re Trejo*, 462 Mich 341; 612 NW2d 407 (2000).[2] Respondent argues only that termination of his rights did not serve AM's best interests.

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012); see MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). Factors that a trial court may consider in determining whether removal from parents serves a child's best interests include the child's bond to his parent; the parent's parenting ability; the child's need for permanency, stability, and finality; and the suitability of alternative homes. *In re Olive/Metts*, 297 Mich App at 41-42. Other factors may include the parent's history of domestic violence; the parent's compliance with his or her case plan, services, and parenting-time visits; the children's well-being

---

[2] Having reviewed the record, we conclude that the trial court did not err by finding that clear and convincing evidence established statutory grounds for termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*) and (j).

while in care; and the possibility of adoption. *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014).

Regarding stability and permanence for AM, respondent argues that AM would simply end up in a state orphanage if not allowed to return to his care. The record, however, indicates that terminating his rights moved toward, not away from achieving permanence for AM. Respondent offers his conclusory assertion that the current foster parent is not willing to adopt AM. The record is silent regarding adoption and only indicated that the foster parent was not willing to enter into a guardianship of AM if parental rights were maintained. Further, it remains possible that AM could eventually be returned to her mother whose rights have not been terminated. The trial court appropriately found based upon record evidence that AM would require consistent, stable care in a calm environment, and that AM's emotional stability would be greatly disturbed with the "drama, instability, insecurity that [respondent] could create if he still retained his parental rights."

Respondent also blames the trial court for the weakened bond between himself and AM because the trial court suspended his parenting time for so long. The record indicates that respondent originally participated in the parenting-skills and supportive-visitation sessions. Respondent's parenting time was suspended first because of the pandemic and later temporarily when caseworkers gained a better understanding of AM's mental-health needs and it became apparent that AM's parents required further education to learn how to interact more effectively with AM because of her special needs. Respondent, however, had no interest in participating to learn about AM's conditions and how to interact with her in light of those conditions. The trial court only then suspended indefinitely his parenting time. Rather than work to develop the necessary parenting skills to enable proper care and custody of AM, respondent failed to complete and benefit from services.

We find no merit to respondent's contention that the trial court acted to punish or retaliate against him by suspending his parenting time. Respondent's own lack of willingness to learn how to interact specifically with AM, given her unique, special needs, caused his parenting-time suspension. Because he quit participating in parenting-skills services, he never acquired the skills needed to safely and appropriately interact with AM and, as a result, his parenting time never resumed. Therefore, although the trial court originally suspended parenting time, respondent's own actions and inactions prevented parenting time from being reinstated. The trial court cannot be blamed for the diminishment of his bond with AM. He alone bears responsibility for that.

The record also indicates that respondent, frustrated and angry after his parenting times were suspended, refused to participate in services. That caused respondent to fail to learn the requisite skills to adequately parent AM and provide her the care and custody she needed. Despite his demonstrated ability to care for his older, average-needs children, he continued to lack the skills to parent AM and provide for her special needs.

The record indicates that the trial court considered and weighed the applicable best-interest factors and none of these factors tended to favor respondent. We conclude that the trial court did not err when it found by a preponderance of the evidence that termination of respondent's parental rights served AM's best interests.

Affirmed.

/s/ Christopher M. Murray
/s/ Colleen A. O'Brien
/s/ James Robert Redford