# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* D. CREWS, JR., Minor.

UNPUBLISHED
February 28, 2017

No. 333615
Kent Circuit Court
Family Division
LC No. 14-051081-NA

Before: BORRELLO, P.J., and MARKEY and M. J. KELLY, JJ.

PER CURIAM.

Respondent father appeals as of right the trial court order terminating his parental rights to the minor child DC (d/o/b March 17, 2011) under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist) and (g) (failure to provide proper care and custody). For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

On March 3, 2014, respondent pleaded guilty to assault by strangulation, and he was subsequently sentenced to 1 year and 6 months to 10 years' imprisonment. Respondent's sentence began on April 23, 2014.

On April 9, 2014, a petition was filed. The petition alleged that on December 13, 2013, respondent assaulted mother at Red Roof Inn while DC was in the room; that respondent was facing criminal charges for assault by strangulation as a result of the incident; and that respondent was currently incarcerated at the Kent County Jail. Moreover, the petition alleged that respondent and mother were substantiated for a CPS referral, which was received on December 14, 2013, regarding allegations of domestic violence and failure to protect and that respondent's criminal history included second-degree murder and a felony weapons charge. The petition further alleged that mother admitted to CPS that respondent assaulted her several times in the past and admitted that there was a history of domestic violence in their relationship.

On April 9, 2014, at a preliminary hearing, respondent waived the probable cause determination and issues regarding placement. The court authorized the petition, placed the children with DHHS, and ordered supervised parenting time upon respondent's release.

The court held dispositional review hearings in August and November, 2014. A caseworker testified that respondent's earliest release date was June 13, 2015, and his maximum release date was December 13, 2023. The caseworker testified that substance abuse services,

-1-

parenting classes, and group and individual counseling services were available to respondent where he was incarcerated and that she would send respondent a letter regarding what he needed to do going forward. Respondent admitted to the following: 1) he assaulted mother at Red Roof Inn while DC was present in the room on December 13, 2013; (2) he pleaded guilty to assault by strangulation and was sentenced to 18 months to 10 years' imprisonment as a result of the incident; (3) on December 14, 2013, CPS received a referral regarding allegations of domestic violence and failure to protect, mother and respondent were both substantiated, and the investigation was completed by CPS Worker Ashleigh Wible; (4) his criminal history included "Felony homicide and Felony weapons charges on 3/17/1998," and he was convicted of second-degree murder.

At another dispositional review hearing, a caseworker testified that she had contact with respondent via mail and that she sent him information on parenting and gave him assignments, which respondent completed successfully. DC was unable to visit respondent at the jail and the caseworker recommended Skype and telephone contact and the trial court agreed.

Other testimony during the dispositional review hearings in February and May, 2015, indicated that respondent was calling DC on the phone about once a month, that DC was present during the assault and had issues with overcoming the trauma, that respondent was doing his assignments and homework and self-reporting that he participated in AA/NA programs through the Michigan Department of Corrections (MDOC). At the May 13, 2015, review hearing, a caseworker testified that DC was doing very well in placement and that it was in DC's best interests to terminate respondent's parental rights because he had been in placement for 13 months and he needed stability. Another caseworker testified that respondent could not provide care for DC. The court recognized that respondent's options for domestic violence training was limited through the MDOC, but stated that reunification was no longer the goal and that adoption was the long-term goal.

On August 20, 2015, petitioner filed a petition to terminate and the court held a termination hearing on September 16, 2015. However, after hearing testimony from the caseworker and from respondent, the trial court denied the petition. The trial court expressed concern that a domestic violence class was greatly needed and found that respondent should be afforded an opportunity to engage in the class to overcome barriers to reunification.

Thereafter, the trial court held several review hearings. At a February 17, 2016, review hearing, a caseworker testified that respondent was still incarcerated, he was not taking full responsibility for his action, and was minimizing his behavior and his prior conviction. The caseworker rated respondent's progress on domestic violence as "poor." The caseworker testified that respondent was still participating in a domestic violence class called Bridges. Respondent reported that he skipped an employment class because he had a different class during that time period. Respondent's release date was deferred because he had not completed Bridges, and she did not know when he could be reevaluated for release. Stark again recommended that the goal of reunification be changed to adoption because respondent remained incarcerated and lacked progress in dealing with the domestic violence issues. Furthermore, after two years, the agency was not closer to reunification and DC was in care for almost two years. Because respondent's release date was unclear, reunification could not be achieved within a reasonable amount of time.

Respondent testified that he completed Bridges on January 27, 2016, and that the parole board was prepared to make a decision on his release sometime during the month of the hearing (i.e. February 2016). Respondent testified that he had a job lined up for when he was released and he planned to live with his stepfather.

Following the testimony, the court found that although DC was in relative placement, reunification was no longer an appropriate permanency goal, and it noted that, even after release, respondent would have to establish stability in his life. The trial court continued all prior orders, scheduled the termination hearing, but noted that petitioner had discretion in whether or not to file a petition because respondent did some homework and may be released soon.

On April 25, 2016, DHHS filed a petition to terminate alleging that respondent remained incarcerated, that his parole was deferred, that there was a substantial history of domestic violence, and that respondent continued to minimize his past behavior. Furthermore, respondent did not have a viable long-term plan for DC, he had a minimal bond, and given his indeterminate release date, he would not be able to provide reasonable care within a reasonable time.

On May 11, 2016, the termination hearing was held, and respondent was present for the hearing. The caseworker verified that respondent would be paroled on June 9, 2016. The caseworker, Elin Stark, testified that the reasons for removal were domestic violence, substance abuse, unstable housing, and improper care. Stark further testified that the primary barrier was domestic violence, that the improper care barrier was due to domestic violence in front of the children, and that respondent self-reported previous marijuana use and unstable housing. According to Stark, respondent went back and forth about whether or not DC witnessed domestic violence between him and mother.

With respect to services, Stark testified that that respondent participated in the Bridges domestic violence class and that she sent respondent monthly letters relating to domestic violence, substance abuse, parenting skills, and trauma. Stark further testified that respondent started Bridges in August 2015 and completed it in January 2016. According to Stark, Bridges was in a group setting, but the prison did not provide her with much information on the program, which was the reason why she was so specific about respondent providing her information about what he was learning. Stark noted that, despite her attempts, she never had the opportunity to talk to the Bridges program director and the prison would not return her telephone call.

Stark testified that she hoped that Bridges would help respondent understand the impact that domestic violence had on mother, DC, and himself. Stark further testified that she did not feel like respondent benefitted from the class or was ready to care for a child. According to the caseworker, she discussed DC being present for the assault by strangulation on mother during numerous telephone conversations with respondent, but respondent continued to maintain that DC was sleeping during the incident. Stark testified that she indicated to respondent that DC may have appeared to be sleeping but was nonetheless in the room. Stark further testified that respondent reported that DC may have heard him speak unkindly to mother; however, respondent still struggled taking accountability for what happened between him and mother. According to Stark, respondent previously testified that there was only one domestic violence incident between himself and mother (i.e., the assault by strangulation), and she spoke to respondent about how the background evidence did not support that testimony. Stark testified

that respondent maintained that there was only name calling rather than previous incidents of physical violence. Stark explained that mother disputed respondent's assertion, that mother reported numerous incidents of violence, that DC's half-brother reported multiple incidents of domestic violence and that DC reported multiple incidents of domestic violence during counseling with his therapist. Stark stated that both children made the statements to the therapist in a clinical setting but that she was unsure whether any forensic protocol techniques were used.

Stark stated that she was concerned that respondent took Bridges but was still not accepting full responsibility for his actions. Stark testified that it was important for respondent to take responsibility for him to understand the impact domestic violence had on his son and to recognize the signs as he moved forward. Stark explained that she had been asking respondent since August 2015 to write out 10 sentences regarding how the information he was learning in Bridges related to his own life, and respondent recently wrote to her a letter explaining why he had not written out those 10 sentences. Stark testified that respondent briefly talked about the impact of domestic violence but struggled to relate how the domestic violence impacted mother and DC. Stark further testified that she spoke with respondent and gave him examples of what she was looking for with the 10 sentences and that she was looking for more insight on issues such as walking through why the incident happened, how it could be prevented, and what respondent learned moving forward. According to Stark, the point of the exercise was not to rehash information but to understand how the event could be traumatic to a child's ability to feel safe, which was one of the things that respondent failed to understand. Stark testified that respondent's letter was insufficient, that she explained to respondent her role numerous times, but that respondent talked about not being comfortable. Stark testified that she brought up the letter and his mention of her being beautiful, but respondent did not have much to say.

Stark testified regarding a conversation with respondent about her expectations upon release and about how release would affect DC. Stark further testified that respondent felt that there would not be an adjustment for DC so she sent him an article about adjusting to parenthood when a child was first entering the home. According to Stark, respondent replied that the article did not apply to him. Stark explained to respondent why she thought the article applied to him and noted that DC was in placement for quite some time, but respondent disagreed with her. Stark further explained that, when she noted that respondent was gone for two years and that an adjustment period would be required; respondent responded that he did not want to separate DC from the maternal grandparents, but stated he did not want to be cut out from DC's life.

Stark testified that respondent had not had face-to-face communication with DC in over two years and that she strongly believed that there would be a tremendous adjustment for DC, because of how bonded he was to his grandparents. According to Stark, respondent was not in a spot where he could care for DC in a safe manner. Stark testified that, before DC could be returned to respondent's care, respondent would be expected to engage in numerous services.

Stark testified that she had consistent conversations with respondent about working on a treatment plan upon release and working toward returning his son to his care, but Stark testified that respondent would respond in an unclear manner regarding whether he wanted DC to stay with the grandparents. Stark testified that respondent indicated that his plan was to live with his stepfather. Stark testified that she spoke with the owner of the plastics company that respondent previously gave her the contact information for, and she noted that respondent did not have a job

setup there upon release. According to Stark, respondent indicated that he would have to do something else to obtain employment.

Since being assigned to the case, Stark continually asked and encouraged respondent to write letters to DC. Stark testified that respondent did not say anything when she addressed the matter with him, that she told respondent she could give the letters to DC's therapist, and that she would like letters to be read to DC to see how he responded. However, Stark explained that respondent only sent two letters and a birthday email for DC.

Stark recommended that the trial court terminate respondent's parental rights. According to Stark, the bond between respondent and DC was minimal, they had not seen each other in over two years, and DC was very bonded to his grandparents. Stark rated respondent's willingness and effort to contact DC as poor. Stark noted that DC was in relative placement but that the placement was in existence for over two years. Stark noted that incarceration was not the sole reason for termination and that respondent's inability to parent, the existing barriers that brought DC into care and lack of a place for DC to return to were the reasons she supported termination.

Stark further testified that she spoke to the maternal grandparents about the possibility of a guardianship, that they were not willing to do a guardianship, and that they did not feel as if a guardianship was as permanent as adoption. Stark explained that the grandparents were about to finalize adoption for DC's half-brother and stated that terminating respondent's parental rights would allow DC to be in the same legal situation as his brother. According to Stark, DC expressed a desire to stay with his grandparents and brother and the grandparents wanted to adopt. Stark testified that DC was five years old now and was ready for permanence, stability, and finality. Stark further testified that respondent had not shown the ability to parent or the ability to recognize how his actions affected his son, or recognize the adjustment that would be required due to the bond with the grandparents. Stark believed that respondent was given the opportunity to develop insight but failed to do so and she did not believe that respondent would be able to rectify the barriers within a reasonable amount of time.

Respondent testified that he did not want to give up his parental rights and he denied stating that he wanted DC to stay with the grandparents. Respondent stated that he had living arrangements and employment lined up for when he was released from prison. Respondent stated that he completed AA and Bridges while in prison. Respondent acknowledged that he smoked marijuana every day before he was incarcerated, but he believed that the marijuana use did not interfere with his ability to parent. Respondent testified that he would smoke marijuana, get high, and then provide childcare but that mother was present too. Respondent explained, "All I do is hang out with my son. We just bond and hang out with each other."

Respondent testified that he admitted to choking mother in his letter but that he did not get into what led up to the incident. However, respondent testified that he regretted choking mother. With respect to the choking incident, respondent testified that there was an argument and he became angry, that he and mother raised their voices, that he pushed and/or choked mother, but that it was reasonable to believe that DC slept through the incident. Respondent further testified that he thought DC was "coached" with respect to his reports of domestic violence. Respondent indicated that he did not think that he needed domestic violence

counseling after release but that it would not hurt.  However, respondent agreed that parenting classes would be helpful for him and that he could learn a lot from them.

After summarizing the case and discussing the evidence, the trial court found that termination under MCL 712A.19b(3)(c)(*i*) was established based on respondent's failure to benefit from domestic violence services and it noted respondent's previous substance abuse.  The trial court reasoned that respondent merely admitted to making a mistake, that DC was in care for an extended period, and that it would take a long time to reintegrate respondent with his son.  The trial court further reasoned that making DC wait such a long time was unreasonable.  The trial court found that 19(b)(3)(g) was established for similar reasons.  The trial court reasoned that, even not considering the incarceration, respondent was just working, getting high, and then spending time with his son rather than parenting.  The trial court further reasoned that DC was traumatized by domestic violence.  With respect to 19(b)(3)(n), the trial court found that this statutory ground was not established because the conviction occurred before DC was born.  Subsequently, the trial court found that termination was in DC's best interests, and it terminated respondent's parental rights.  This appeal ensued.

## II.  TERMINATION PETITION

Respondent argues that the trial court erred in permitting petitioner to file a termination petition.  The filing of a termination petition is governed by statute; the interpretation of a statute is a question of law that we review de novo.  *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010).

Respondent argues that the trial court erred in allowing DHHS to circumvent the requirements of MCL 712A.19b(3)(h) by seeking termination under MCL 712A.19b(3)(c)(*i*) and MCL 712A.19b(3)(g) instead.   In relevant part, MCL 712A.19b(3) provides the following grounds for termination:

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(h) The parent is imprisoned for such a period that the child will be deprived of a normal home for a period exceeding 2 years, and the parent has not provided for

-6-

the child's proper care and custody, and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

Respondent argues that because the conditions for subsection (h) were not met—i.e. respondent was not incarcerated for two years after the filing of the termination petition—DHHS was barred from seeking termination under subsections (c)(*i*) or (g). Respondent cites *In re Mason*, 486 Mich at 142, in support of his argument. This argument lacks merit.

In *Mason*, our Supreme Court, in relevant part, held that the trial court erred in terminating the respondent's rights under (h), (c)(i) and (g). With respect to (h), the *Mason* Court held that the trial court improperly terminated the respondent's rights for several reasons: (1) the respondent was expected to be paroled in less than two years; (2) the trial court clearly erred in concluding that respondent would need at least six months upon release from prison to be ready to care for the minor children because the testimony was unsupported, the respondent's parenting skills were not evaluated, and the respondent was not afforded services; (3) the trial court failed to consider whether the respondent "could fulfill his duty to provide proper care and custody in the future by voluntarily granting legal custody to his relatives during his remaining term of incarceration." *Id*. at 164.

After addressing (h), the *Mason* Court cited (c)(*i*) and (g), and explained: "As under MCL 712A.19b(3)(h), each of these grounds requires clear and convincing proof that the parent has not provided proper care and custody and will not be able to provide proper care and custody within a reasonable time." *Id*. at 164-165. Thus, the Court held that (c)(*i*) and (g) were "factually repetitive and wholly encompassed by MCL 712A.19b(3)(h)" and that, "[b]ecause the court erred in evaluating whether respondent could care for his children in the future, either personally or through his relatives, termination under MCL 712A.19b(3)(c)(*i*) or (g) was also premature." *Id*. at 165.

On appeal, respondent seems to argue that, except for when an incarcerated parent directly abused a child, agencies cannot seek to terminate parental rights under (c)(*i*) and (g) when (h) is inapplicable. However, we cannot glean any language in MCL 712A.19b(3) that limits DHHS' ability to allege multiple grounds for termination. In fact, the statute acknowledges that there are instances where more than one statutory ground is applicable. See MCL 712A.19b(3) ("The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, *1 or more of the following*:") (emphasis added). Nevertheless, respondent argues that *Mason* "held that courts cannot find grounds for termination under sections (c)(i) or (g) if the conditions for (h) cannot be met." In support of the argument, respondent relies on the Court's statement that (c)(*i*) and (g) "are factually repetitive and wholly encompassed by MCL 712A.19b(3)(h)."

Contrary to respondent's argument on appeal, *Mason* did not conclude that courts could not find (c)(*i*) or (g) if (h) is not established. Rather, the *Mason* Court explained that (h) has three requirements: (1) "a parent's imprisonment deprives a child of a normal home for more than two years," (2) "the parent has not provided for proper care and custody," and (3) a "forward-looking" condition that "asks whether a parent 'will be able to' provide proper care and custody within a reasonable time." *Id*. at 161. The Court further explained that both (c)(*i*) and

(g) have this forward-looking condition that requires proof that a parent "will not be able to provide proper care and custody within a reasonable time" and that "each of these grounds requires clear and convincing proof that the parent has not provided proper care and custody . . . ." *Id*. at 164-165. Thus, the Court concluded, "As such, these additional grounds are factually repetitive and wholly encompassed by MCL 712A.19b(3)(h). *Because the court erred in evaluating whether respondent could care for his children in the future*, either personally or through his relatives, termination under MCL 712A.19b(3)(c)(*i*) or (g) was also premature." *Id*. at 165 (emphasis added). As such, (c)(*i*) and (g) were not established in *Mason* because the trial court terminated the respondent's parental rights based solely on his incarceration status and because the trial court failed to evaluate whether he could provide future care. Further, in reference to MCL 712A.19a(6)(c), the Court held that "the court and the DHS failed to consider that respondent had never been evaluated as a future placement or provided with services." *Id*. at 159. Thus, the trial court in *In re Mason* was not required to order initiation of termination proceedings.

This case is distinguishable from *Mason* in several significant ways: (1) the facilitation of services, (2) participation in the proceedings, and (3) the fact that respondent's parental rights were not terminated solely because of his incarceration. In this case, trial court primarily based termination on respondent's failure to internalize and benefit from domestic violence services, and the fact that respondent's domestic violence occurred while DC was in the same room. As discussed below, there was sufficient evidence to establish a statutory ground for termination. With respect to ordering termination proceedings, although DC was in foster care for at least 15 of the most recent 22 months, he was being cared for by relatives; thus, the trial court was not required to order initiation of termination proceedings. MCL 712A.19a(6)(a). However, the trial court was not barred from reaching such a conclusion. The trial court acknowledged relative placement and MCL 712A.19a(6)(a), but it based its decision to allow petitioner to file a supplemental petition on the length of time DC was in placement, DC's best interests and desire to be with his sibling, the amount of time respondent would need to establish stability, and respondent's failure to benefit from domestic violence counseling. In conclusion, the trial did not err allowing petitioner to file a termination petition. *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008).

III. HEARSAY

Next, respondent argues that the trial court relied on hearsay evidence in terminating his parental rights. Specifically, respondent argues that the trial court relied on hearsay testimony regarding his history of domestic violence and on hearsay contained in the termination report, which included statements regarding his lack of communication with the minor child.

To the extent that this issue is preserved, "[e]videntiary rulings are reviewed for an abuse of discretion; however, we review de novo preliminary questions of law affecting the admission of evidence, e.g., whether a statute or rule of evidence bars admissibility." *In re Martin*, ___ Mich App ___, ___; ___ NW2d ___ (2016) (Docket No. 330231). Respondent did not object to the termination report, and, in this respect, our review is "limited to plain error affecting substantial rights." *In re Utrera*, 281 Mich App at 8.

Under MCR 3.977(F) and (H), the rules of evidence do not apply to the dispositional phase of the proceedings when termination is based on the same conditions that led to adjudication; however, legally admissible evidence is required when termination is based on "new or different" circumstances. See MCR 3.977(H)(2) ("The Michigan Rules of Evidence do not apply . . ."); *In re Mays*, 490 Mich 993, 993-994; 807 NW2d 307 (2012), quoting MCR 3.977(F)(1)(b) (explaining that "MCR 3.977(F)(1)(b) requires 'legally admissible evidence' that the grounds for termination are established *when the petitioner seeks to terminate parental rights 'on the basis of one or more circumstances new or different from the offense that led the court to take jurisdiction' ")* (emphasis added). The court rules do not define the terms "new" or "different." However, under the former version of MCR 5.974,[1] this Court indicated that "new or different" circumstances are circumstances that are unrelated to the basis under which jurisdiction was assumed over a minor child:

> [T]he court rules distinguish two situations: (1) the basis for the court taking jurisdiction of a child is *related* to the basis for seeking termination of parental rights and, (2) the basis for the court taking jurisdiction of a child is *unrelated* to the basis for seeking termination of parental rights. In the first situation, legally admissible evidence (under the rules normally used in civil proceedings) will already have been adduced at the adjudicative-phase trial, and thus *supplemental* proofs, which are presented on a background of such legally admissible evidence, need not be admissible under the Michigan Rules of Evidence. MCR 5.974(D)(3) (termination sought in initial petition); MCR 5.974(F)(2) (termination based on grounds *related* to those established in initial petition). . . .
>
> In the second situation, the basis for terminating parental rights lacks this background of legally admissible evidence from the adjudicative phase and, thus, such a foundation must be laid before probative evidence not admissible under the Michigan Rules of Evidence may be considered. MCR 5.974(E)(1)[2]. . . . Here, because it is conceded the grounds for termination are *unrelated* to the basis on which the probate court initially established its jurisdiction over the children, such legally admissible evidence was necessary to establish the factual basis for a finding of parental unfitness warranting termination on any of the grounds specified in § 19b. This is what distinguishes MCR 5.974(E), which by its terms applies when the petition for termination is based on one or more circumstances

---

[1] "The rules governing juvenile proceedings have since been amended and renumbered, effective May 1, 2003. MCR subchapter 5.900 was moved to new MCR subchapter 3.900, and MCR 3.977 corresponds to former MCR 5.974." *In re Utrera*, 281 Mich App 14 at n 4.

[2] Under the former MCR 5.974(E)(1), "If termination is sought on the basis of one or more circumstances 'new or different' from those that led to the original assumption of jurisdiction, '[l]egally admissible evidence must be used to establish the factual basis of parental unfitness sufficient to warrant termination of parental rights.' " *In re Gilliam*, 241 Mich App 133, 137; 613 NW2d 748 (2000), quoting MCR 5.974(E)(1). See also *In re Utrera*, 281 Mich App at 18 n 5 ("Former MCR 5.974(E) corresponds to current MCR 3.977(F).").

new or different from the offense that led the court to take jurisdiction, and MCR 5.974(F)(2), which, although containing no limiting terminology, follows MCR 5.974(E) with its specific mandate and thus applies only to those matters not within the scope of MCR 5.974(E). [*In re Snyder*, 223 Mich App 85, 89-90; 566 NW2d 18 (1997) (third emphasis in original).]

In this case, the trial court took jurisdiction over the minor child based on respondent's December 2013 act of domestic violence (i.e., his assault by strangulation of mother with the minor child present in the room); respondent's prison sentence and CPS substantiation resulting from that incident; and respondent's criminal history, which included a second-degree murder conviction. Termination was sought based on this incident of domestic violence and on respondent's failure to benefit from domestic violence services. In support of termination, petitioner made allegations and introduced evidence regarding respondent's history of domestic violence with mother in front of her children.

Respondent denied a history of physical violence between him and mother, and he argues on appeal that petitioner failed to introduce legally admissible evidence regarding his history of domestic violence. However, the basis under which the trial court took jurisdiction over the minor child was related to the basis under which termination was sought. Respondent's act of domestic violence upon mother is related to his other acts of domestic violence upon mother, and his history of domestic violence was relevant to whether he could rectify the conditions that led to adjudication. Cf. *In re Mays*, 490 Mich at 993-994, quoting MCR 3.977(F)(1)(b) (explaining that "MCR 3.977(F)(1)(b) requires 'legally admissible evidence' that the grounds for termination are established *when the petitioner seeks to terminate parental rights 'on the basis of one or more circumstances new or different from the offense that led the court to take jurisdiction'* ") (emphasis added). Accordingly, legally admissible evidence was not required to establish respondent's history of domestic violence with mother as support for termination of his parental rights under MCL 712A.19b(3)(c)(*i*) and (g). See MCR 3.977(H)(2).

Moreover, even if we were to find error in the admission of the evidence regarding respondent's history of domestic violence with mother, the error would be harmless. Although the trial court mentioned that there was "significant domestic violence" in its reasoning for (g), the trial court did not rely on respondent's history of domestic violence in its reasoning for (c)(*i*); rather, the trial court primarily relied on respondent's assault by strangulation of mother and his failure to benefit from services. Thus, error in considering hearsay regarding respondent's history of domestic violence would be harmless, and substantial justice does not call for reversal. MCR 3.902(A); MCR 2.613.

In addition to testimony regarding his history of domestic violence, respondent challenges the admissibility of the termination report, which contained statements regarding his lack of communication with the minor child. However, at the termination hearing, petitioner offered the termination report as an exhibit, and respondent's counsel responded, "I have no objection, your Honor." Moreover, the termination report stated, "It has been reported by the relative caregivers that *and* [respondent] himself that he has not had much contact with his son the duration of his life due to the choices he has made in life" (emphasis added). The portion attributed to respondent was his own statement and was not hearsay. See MRE 801(d)(2)(A) (explaining that statements are not hearsay if they are "offered against a party" and are "the

party's own statement"). Furthermore the termination report was duplicative of other evidence that showed respondent did not have much contact with the minor child during the course of the child's life. Respondent has not demonstrated a plain error affecting his substantial rights with respect to admission of the termination report. *In re Utrera*, 281 Mich App at 8-9.

## IV. STATUTORY GROUNDS FOR TERMINATION

Finally, respondent argues that the trial court clearly erred in finding that a statutory ground for termination was established.

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App at 139. This Court reviews the trial court's determination for clear error. *Id.*; MCR 3.977(K). "A finding is 'clearly erroneous' if, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made." *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009). "To be clearly erroneous, a decision must strike [this Court] as more than just maybe or probably wrong . . . ." *In re Sours*, 459 Mich 624, 633; 593 NW2d 520 (1999) (quotation marks and citation omitted). Further, this Court gives "deference to the trial court's special opportunity to judge the credibility of the witnesses." *In re HRC*, 286 Mich App at 459.

MCL 712A.19b(3)(c)(*i*) provides:

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

This Court has previously held that termination was proper under (c)(*i*) where "the totality of the evidence amply support[ed] that [the respondent] had not accomplished any meaningful change in the conditions" that led to adjudication. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009). Here, respondent's initial dispositional order was entered on November 25, 2014, and the termination hearing was held on May 11, 2016. Thus, "182 or more days [had] elapsed since the issuance of an initial dispositional order." See MCL 712A.19b(3)(c).

The conditions that led to respondent's adjudication were his December 2013 act of domestic violence (i.e., his assault by strangulation of mother with the minor child present in the room); his prison sentence and CPS substantiation resulting from that incident; and his criminal history, which included a second-degree murder conviction. It is undisputed that respondent participated in and completed a domestic violence class. Further, respondent completed various assignments given to him by caseworkers. However, Stark testified that respondent was minimizing and was not accepting full responsibility for his actions. Although respondent admitted to choking mother in his letter, he testified at the termination hearing and continued to minimize by maintaining that he pleaded guilty to assault by strangulation because he pushed mother and made contact with the area below her chin. To the contrary, the record indicates that

-11-

respondent choked mother until she passed out. The CPS Investigation Report regarding the December 14, 2013 complaint stated that mother reported the following information about the assault: respondent hit, kicked, punched, and began choking her; she asked respondent to stop indicating that he was going to kill her; and respondent asked her whether she "want[ed] to know what it feels like to die" and then choked her until she passed out. It was further reported that the altercation took place over the course of three hours and that respondent would not let mother go to the hospital when she awoke the following morning. According to the report, mother stated that respondent abused her in front of the children. Even without considering respondent's history of domestic violence against mother, respondent's minimization of the December 2013 incident is supported the trial court's conclusion that the conditions that led to adjudication continued to exist.

On appeal, respondent argues that Stark was unqualified to opine on whether he benefitted from services. Indeed, Stark testified that she did not feel like respondent benefitted from Bridges. However, Stark, who worked with respondent during the case, reached her conclusion based on her own interactions with respondent and his responses when she asked for insight as to what he learned. Moreover, the trial court reached its conclusion that respondent failed to benefit based in part on the letter that respondent wrote. Respondent wrote a letter in response to the request for 10 sentences explaining how he benefitted from domestic violence services. The trial court acknowledged respondent's letter but nonetheless found that the domestic violence barrier continued to exist. As the trial court noted, the letter did not explain how the domestic violence affected the minor child or state what the red flags were, what the different forms of abuse were, or what the tools were. Based on the record, respondent had not accomplished a meaningful change in reducing his domestic violence barrier, and the trial court's finding that respondent's domestic violence issues continued to exist was not clearly erroneous. See *In re Williams*, 286 Mich App at 272 ("Although respondent mother embarked on a commendable effort to treat her addiction several months before the termination hearing, the totality of the evidence amply supports that she had not accomplished any meaningful change in the conditions existing by the time of the adjudication"); see also *In re Sours*, 459 Mich at 633 ("To be clearly erroneous, a decision must strike [this Court] as more than just maybe or probably wrong . . .") (quotation marks and citation omitted).

For similar reasons, the record demonstrates that there was not a reasonable likelihood that respondent would rectify the conditions within a reasonable time considering the minor child's age. As explained above, respondent minimized his December 2013 act of domestic violence against mother, and he had not accomplished a meaningful change in reducing his domestic violence barrier. The minor child was removed from the home in April 2014 when he was approximately three years old, and the termination hearing took place approximately 25 months later. See *In re Dahms*, 187 Mich App 644, 647; 468 NW2d 315 (1991) (explaining that the language in (c)(*i*) indicates "that the Legislature did not intend that children be left indefinitely in foster care"). Based on respondent's failure to benefit, his minimization, the length of this case, the minor child's age, and the lack of respondent's effort to communicate with the child, the trial court did not clearly err in finding that there was not a reasonable likelihood that respondent would rectify the conditions within a reasonable time considering the minor child's age. Although respondent made a commendable effort in participating in services, the totality of the evidence demonstrates that he did not achieve a meaningful change in the conditions that led to adjudication, and there was not a reasonable likelihood that he would

accomplish such a change in a reasonable time.  Thus, the trial court did not clearly err in finding that there was grounds for termination under MCL 712A.19b(3)(c)(*i*).  *In re VanDalen*, 293 Mich App at 139.  Because there was one ground for termination, "we need not consider the additional grounds upon which the trial court based its decision."  *In re HRC*, 286 Mich App at 461.

Affirmed.


/s/ Stephen L. Borrello
/s/ Jane E. Markey
/s/ Michael J. Kelly