*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re S. S. DEANGELO-WHITE, Minor.

UNPUBLISHED
December 29, 2020

No. 352804
Kent Circuit Court
Family Division
LC No. 18-051755-NA

Before: FORT HOOD, P.J., and SAWYER and SERVITTO, JJ.

PER CURIAM.

Respondent-father appeals as of right the trial court's order terminating his parental rights to his daughter SDW. We affirm.

SDW was born to respondent-father and SDW's mother on February 16, 2015. Respondent-father and SDW's mother ("mother") were never married, but respondent established his paternity of SDW through a family court case. On May 29, 2018, Child Protective Services (CPS) received allegations that mother and her boyfriend were using methamphetamine in their home while SDW and her infant sister (who has a different father) were present. CPS made an unannounced home visit on May 30, 2018 and mother admitted that she and her boyfriend had used methamphetamine in the home the night before, that she had been using it for the last three months, and that she used it when the children were present in her home. Mother also had a bruised nose due to the boyfriend's physical abuse of her and admitted to CPS that there had been continuous domestic violence between the two of them.

Ultimately, the police became involved in the unannounced home visit due to actions of mother's boyfriend. Mother gave the police permission to have her house searched and police found evidence of drug use. The house was also noted to be in bad shape, with a shattered sliding door, holes in walls, a door off hinges, an unpleasant odor in the children's room, and ripped carpet, among other things.

Respondent resided in Massachusetts when this matter was initiated and had not seen SDW since she was an infant. As a result, a safety plan was made for SDW and her sibling to stay with a relative. The children were also assessed at a hospital for methamphetamine exposure. SDW tested positive for methamphetamines on May 30, 2018.

The Department of Health and Human Services (DHHS) thereafter filed a petition with the court relating all of the above and requesting that the children be made temporary wards of the state. In the petition, DHHS noted that during the course of its investigation, multiple attempts were made to contact respondent-father at his last known address and phone number and respondent-father did not reply.

At an August 29, 2018 adjudication and disposition hearing, mother admitted to the allegations in the petition. Respondent-father was not present, so he was not adjudicated at that time. At a November 20, 2018 permanency planning hearing, foster care worker Brooke Pratt testified that she had made multiple efforts to contact respondent-father since July 2018 with no response. Pratt testified that she finally spoke with respondent-father on the phone on November 6, 2018, and he admitted to being SDW's legal father. Respondent-father told Pratt that he had sent money and clothes to mother for SDW's care, but none of it was documented through the court. Respondent-father also told Pratt that the last time he had seen SDW was in December 2015, that SDW's mother had cut off contact with him, and he did not know that SDW was in foster care. Pratt testified that despite the fact that she told respondent-father he would need to stay in contact with her for reunification between he and SDW to work, respondent-father was unresponsive to her multiple attempts to contact him since November 6, 2018.

An adjudication with respect to respondent-father took place on December 20, 2018. The court opined that respondent-father was aware of SDW's situation at least as of his November 6, 2018 conversation with Pratt, and that it had been shown by a preponderance of the evidence that respondent-father had neglected to provide proper care and custody for SDW. The trial court noted that respondent-father was quite far behind on child support payments and took no steps to determine where SDW resided and the status of her overall well-being. The trial court also found that respondent-father's absence for most of SDW's life had the potential to harm the child's well-being. As a result, the trial court adjudicated respondent-father unfit.

Ultimately, the DHHS filed a supplemental petition seeking termination of respondent-father's parental rights to SDW. A termination hearing was held on January 30, 2020, after which the trial court found that termination was appropriate pursuant to MCL 712A.19b(3)(c)(i) and (3)(g) and was in SDW's best interests. Consistent with its opinion, the trial court entered an order terminating respondent-father's parental rights. This appeal followed.

We review for clear error a trial court's factual findings as well as its ultimate determination that a statutory ground for termination of parental rights has been proved by clear and convincing evidence. MCR 3.977(J); *In re Trejo Minors*, 462 Mich 341, 356–357; 612 NW2d 407 (2000). We review the lower court's findings for clear error. MCR 3.977(K); *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010); *In re Sours Minors*, 459 Mich 624, 633; 593 NW2d 520 (1999). A finding is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made. *In re Mason*, 486 Mich at 152.

However, "[t]he time for asserting issues concerning the need services is when the court adopts a service plan . . . ." *In re Terry*, 240 Mich App 14, 27; 610 NW2d 563 (2000). Respondent-father failed to object or indicate that the services provided to him were somehow inadequate, thereby failing to preserve this issue. This Court reviews unpreserved issues for plain error

-2-

affecting substantial rights. *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *In re Diehl*, 329 Mich App 671, 701; 944 NW2d 180 (2019) (quotation marks and citation omitted). "[A]n error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App at 9.

On appeal, respondent-father first contends that the trial court erred in its determination that the foster care agency had provided reasonable efforts for respondent-father to rectify his stated barriers. We disagree.

Before a court may enter an order terminating parental rights, Michigan's Probate Code, MCL 710.21 *et seq.*, requires a finding that the DHHS has made reasonable efforts at family reunification. *In re Hicks/Brown*, 500 Mich 79, 83; 893 NW2d 637 (2017). Such reasonable efforts must be made unless certain aggravating circumstances exist. See MCL 712A.19a(2); *In re Moss*, 301 Mich App 76, 90–91; 836 NW2d 182 (2013). As part of these reasonable efforts, the DHHS must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification. MCL 712A.18f(3)(d) (stating that the service plan shall include a "[s]chedule of services to be provided to the parent ... to facilitate the child's return to his or her home"). While the DHHS has a responsibility to expend reasonable efforts to provide services to secure reunification, there also exists a responsibility on the part of a respondent parent to participate in the services that are offered. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).

In this instance, plain error did not occur when the trial court determined that the DHHS made reasonable efforts to reunify respondent-father with SDW. Respondent-father is correct that it was not a specific barrier on his part that initially brought SDW under the jurisdiction of the court. However, it is impossible to ignore that respondent-father was absent from SDW's life since she was an infant. Had he been involved in SDW's life, respondent-father would have been aware of the conditions in which she lived and perhaps provided a suitable place for her to reside. In an indirect way, then, he is equally as responsible for the fact that SDW was initially taken into foster care.

Additionally, the lower court record is replete with the DHHS's attempts to contact respondent-father throughout the proceedings. Respondent-father proved problematic in tracking down. While respondent-father has attempted to explain his absence from the child's life and lack of knowledge of her well-being on mother's purportedly having cut him off from all communications, there was a custody and support order in effect for SDW. Respondent-father was presumably required to keep the Friend of the Court advised of his address and he was additionally required to pay child support for SDW. The Friend of the Court would thus be a readily available tool for respondent-father's use to ensure that he received any awarded parenting time and was also kept aware of SDW's location and circumstances. The initial address obtained by the DHHS in order to locate respondent-father for these proceedings was, in fact, obtained from Friend of the Court. That address turned out to be not valid.

Moreover, respondent-father asserted that he had no idea where SDW was or that she was in foster care, yet he also claims to have sent money and clothes to SDW. His contradictory

positions highlight that respondent-father submits what amounts to sorely lacking excuses concerning his knowledge of his child's location and welfare.

In any event, there were barriers to reunification identified with respect to respondent-father throughout the proceedings. The initial parent agency treatment plan concerning respondent-father listed housing as a need, given respondent-father's report that his house would be inappropriate for SDW. Parenting skills were also a listed need, and respondent-father was expected to demonstrate the ability to safely meet SDW's unique needs (she had a speech delay, to be present at all meetings he was able, be it by phone or otherwise, and to ask questions about SDW. Respondent-father agreed to attend scheduled telephone visits with SDW, attend a parenting class, engage in twice monthly phone calls with foster care workers, and sign releases as necessary to address all aspects of his parent agency treatment plan.

Unfortunately, respondent-father failed to engage in even the most basic of the above services. There was testimony at the termination hearing that respondent made only approximately one-third of the telephone calls to SDW that he was permitted to make. Respondent was also in Michigan for a week and visited with SDW only once. Respondent did not ask the foster care provider about SDW, and failed to attend many of the proceedings either in person or by telephone. He also failed to return "homework" and background papers to the DHHS.

An updated case service plan identified several more areas that required respondent-father's attention. For example, respondent-father reported a prior problem with substance abuse, but he failed to return paperwork sent to him concerning substance abuse, did not obtain a substance abuse assessment as he had agreed to do, or work with the agency in other ways to demonstrate sobriety. Another identified need was respondent-father's emotional stability. According to the DHHS, respondent-father was given information in regards to mental health providers in his area and was asked to do an intake assessment, but he did not, nor did he participate in a requested psychological exam.

With respect to the identified need of communication skills, there was testimony at the termination hearing that respondent-father had poor communication throughout the proceedings. According to Pratt, she attempted to contact respondent-father a multitude of times with little to no response, including when she sent him information and papers to fill out and requested proof of his income. Pratt also noted in the most recent case service plan that "[respondent-father] takes no responsibility for his lack of investment in [SDW's] life." Pratt further indicated that respondent "still has trouble contacting this worker and makes excuses for it that don't make sense."

Thus, it was established that services were provided to respondent-father in case management, homework, services packets, parenting time phone calls, parenting time video calls, and referrals to psychological services. Respondent-father failed to keep in contact with SDW, with the DHHS, and with the foster care parents, neglected to tell the DHHS when he moved throughout the proceedings, and made little attempt to comply with paperwork and assessment requirements. The evidence firmly established that while services were expended to respondent-father, he failed/refused to participate in most of those services and failed to demonstrate that he sufficiently benefited from the services provided as was his responsibility. *In re Frey*, 297 Mich App at 248. Moreover, respondent has not identified any other services that would have

purportedly benefit him. The DHHS cannot be faulted for failing to provide any unidentified services when the services it did provide were met with silence. The trial court therefore did not err in finding that the DHHS made reasonable efforts at reunification.

Although only briefly touched upon by respondent-father, we also find that the trial court did not err in finding that grounds for termination were established under MCL 712A.19b(3)(g). To terminate parental rights, the trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence. *In re Trejo Minors*, 462 Mich at 355. Termination is appropriate under MCL 712A.19b(3)(g) where:

> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

The first, and most obvious fact in this matter with respect to the above is that respondent-father was personally, and largely financially, absent from SDW from the time she was an infant. Respondent-father asserted that he is financially stable. However, he failed to provide any proof of income, he is behind in his child support obligations and, while he testified to sending money and clothes for SDW's care, there is no verification of the same and no assertion that such items were provided with any regularity. There was also no evidence that respondent-father provided financial support for SDW during the 17 months she was in foster care. Given that, there is no reason to believe that he would do so in any reasonable amount of time given SDW's young age.

In addition, care and custody would necessary include an interest in the child's life and being active in it. Respondent-father had one in-person visit with SDW that went well, but he was in town for a week and made no effort to visit with her an additional time, although provided with an opportunity to do so. Respondent-father also had the opportunity to engage in phone calls with SDW three times per week and managed to participate in only about one-third of the opportunities offered. He also asked no questions of foster care workers or the providers concerning SDW's well-being.

Finally, "failure to comply with the parent-agency agreement is evidence of a parent's failure to provide proper care and custody for the child." *In re JK*, 468 Mich 202, 214; 661 NW2d 216 (2003). As previously indicated, respondent-father failed to comply with even the most minimum tasks in the parent-agency agreement. Given respondent-father's personal and financial absence from the majority of SDW's life and the fact that his inactions demonstrate a continued disinterest (or inability) in engaging in her life on a regular basis, the trial court did not err in finding that clear and convincing evidence established MCL 712A.19b(3)(g). Because only one statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights, *In re Powers Minors*, 244 Mich App 111, 118; 624 NW2d 472 (2000), we need not consider whether the other cited statutory ground has been established.

Respondent-father next argues that it was not in SDW's best interests to terminate his parental rights. Again, we disagree.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). The focus at the best-interest stage has always been on the child, not the parent. *In re Moss*, 301 Mich App at 87.

"The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App at 714.

The preponderance of the evidence standard applies to the best-interest determination. *In re Moss*, 301 Mich App at 83. The trial court's conclusions regarding best interests are reviewed for clear error. *In re Schadler*, 315 Mich App 406, 408; 890 NW2d 676 (2016). In reviewing the trial court's determination, this Court must give due regard to the unique opportunity of the trial court to judge the credibility of those witnesses who appeared before it. *In re Ellis*, 294 Mich App 30, 33; 817 NW2d 111 (2011).

All of the evidence presented supports the trial court's finding that termination in in SDW's best interests. In its best interests analysis, the trial court considered relevant factors, first pointing out that respondent had been adjudicated on December 20, 2018 and was thus fully aware on that date, if not sooner, that SDW was in foster care. Respondent-father was also aware of all the dates and times he could call SDW and his failure to call on many occasions when he had opportunities to do so indicated a lack of parenting ability. The trial court found that there was a bond between respondent-father and SDW from the phone calls they did have, but it was difficult to assess the strength of the bond since he had only physically seen her once in four years.

The trial court found that there was a distinct need for permanence, stability, and finality for SDW. SDW had spent a large amount of time in care, given her young age, and she has special needs. The trial court opined that her special needs and general well-being were being addressed in her foster care home, and that there was no way to gauge respondent-father's willingness to address SDW's special needs. The trial court opined that termination was in SDW's best interests because of all of the above and, because respondent has had all the time she has been in care to be involved and engage and he has failed to do so, the length of time that may be required for him to show a difference was not reasonable, given her age and time already spent in care. We find no error in these findings.

Affirmed.

/s/ Karen M. Fort Hood
/s/ David H. Sawyer
/s/ Deborah A. Servitto