*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* I. D. VELA, Minor.

UNPUBLISHED
November 30, 2023

Nos. 362200; 364920
Lenawee Circuit Court
Family Division
LC No. 20-000500-NA

Before: HOOD, P.J., and SWARTZLE and REDFORD, JJ.

PER CURIAM.

This case returns to us after we remanded for the trial court to address how its termination order was consistent with *In re Plump*, 294 Mich App 270; 817 NW2d 119 (2011). See *In re Vela*, unpublished per curiam opinion of the Court of Appeals, issued December 29, 2022 (Docket No. 362200); *In re Vela*, unpublished order of the Court of Appeals, entered December 29, 2022 (Docket No. 362200). On remand, the court below held an evidentiary hearing on that issue. After the hearing, it again terminated respondent's parental rights to her minor child, IDV, ordering that its previous termination order "stands as written for the reasons set forth on the record." Respondent now appeals as of right from the trial court's termination order on remand.[1] We affirm.

## I. BACKGROUND

### A. FACTS RELATED TO APPEAL IN DOCKET NO. 362200

In our previous opinion, we provided an overview of the factual and procedural background preceding that appeal:

> Respondent is the mother of IDV and two other children, NV and KE. In February 2021, respondent voluntarily released her parental rights to NV after

---

[1] As will be described below, although we retained jurisdiction in Docket No. 362200, the parties filed a new appeal from the termination order on remand in Docket No. 364920. We therefore consolidated the two cases. *In re Vela*, unpublished order of the Court of Appeals, entered February 24, 2023 (Docket Nos. 362200, 364920).

nearly a year under foster care management. In a separate proceeding, the trial court also entered an order terminating respondent's parental rights to KE, who lives under a permanent guardianship with respondent's adopted parents.

> On May 9, 2021, shortly after IDV's birth, Michigan Department of Health and Human Services (MDHHS) filed an emergency ex parte removal petition for protective custody. MDHHS's petition requested removal because IDV's putative father, IV, was physically abusive toward respondent, respondent was homeless, respondent had a history of drug use and missed drug screens, and respondent failed to make progress with services while under court jurisdiction with NV. Regarding drug use, the petition alleged that respondent missed 23 drug screens between June 2020 and December 2020 and admitted to methamphetamine use in September, October, and November 2020. It acknowledged, however, that respondent denied using drugs while pregnant with IDV, a claim that meconium and umbilical cord tests later corroborated. MDHHS requested that the trial court exercise jurisdiction over IDV and remove IDV from respondent's custody. [*In re Vela*, unpub op at 1.]

The trial court granted the petition the same day. *Id*. at 2. It stated in its order to take IDV into protective custody that respondent had failed to progress with her case service plan, including having continued contact with IV, despite a "severe" history of domestic violence and against no contact orders. *Id*. At the preliminary hearing on the petition, the trial court found that domestic violence was the "most significant issue" still "plagu[ing] the family" and authorized the petition, placing IDV in MDHHS's care. *Id*. (quotation marks omitted).

The trial court exercised jurisdiction over IDV, finding that "potential domestic violence in the home and drug use contributing to domestic violence and neglect supported the statutory grounds." *In re Vela*, unpub op at 2. Although respondent showed progress in several aspects of her case service plan after the order of adjudication and dispositional hearing, "[t]he one area in which respondent failed to improve was her continued contact with IV." *Id*. We summarized the history of domestic violence in respondent's previous case and her continued association with IV as follows:

> Throughout her prior case involving NV, there were numerous incidents of domestic violence, with IV assaulting respondent. Many occurred while respondent was pregnant with IDV. IV's domestic violence was apparently exclusively directed at respondent. With the exception of assaults during respondent's pregnancy, there was no evidence of IV assaulting IDV. Throughout the proceedings, there were reports of respondent having contact with IV, despite the court's many warnings that respondent would not regain custody of her child if she continued to see IV. Part of the services offered to respondent included counseling, for emotional stability and her experience as a domestic violence victim. Caseworkers and the court also worked with respondent to develop a safety plan related to IV.

> Based on respondent's progress with parenting classes and developing a bond with IDV, the court and foster care agency allowed respondent to participate in unsupervised overnight parenting time with IDV, beginning around late July

2021. On March 7, 2022, during one of these unsupervised overnight visits, respondent and IV were seen shopping together. Police later found IV hiding in a closet at respondent's residence. After that incident, respondent's parenting time was returned to supervised only. After that change, IDV's mood improved, she started sleeping th[r]ough the night, and she stopped getting diaper rashes.

Respondent was discharged from her domestic violence counseling on March 14, 2022 (a week after IV was found in her apartment). Her counselor stated that respondent was discharged because respondent denied that she still experienced symptoms consistent with domestic violence, and she was able to acknowledge that her relationship with IV was "conflictual." At the termination of parental rights hearing, the trial court concluded that respondent was not credible and "suspect[ed]" that respondent was in contact with IV before he was discovered in her apartment on March 7, 2022. [*In re Vela*, unpub op at 2-3 (footnote omitted).]

In an omitted footnote, we indicated that "[r]espondent was the victim of at least six incidents of domestic violence with IV as the perpetrator between November 1, 2020 and August 28, 2021, including five that occurred when she was between three and five months pregnant" with IDV. *Id*. at 2 n 1.

We then described the change in the permanency planning goal, MDHHS's subsequent filing of a supplemental termination petition, and a portion of the termination hearing. Respondent testified at a review and permanency planning hearing in April 2022, acknowledging that she violated her safety plan by meeting with IV. *In re Vela*, unpub op at 3. In mid-May 2022, MDHHS filed a supplemental termination petition based on respondent's failure to "stop contacting IV" and alleging it was in IDV's best interests to permanently place her with her foster parents. *Id*. In mid-June 2022, the trial court held a combined review hearing and termination of parental rights hearing. *Id*. We noted respondent's progress, indicating she was "continuing to test negative for controlled substances," bonding with IDV, and had been promoted to a manager position at her restaurant job. *Id*. We also noted that she had adequate housing and began individual domestic violence therapy with a new therapist in mid-April 2022. *Id*. The trial court, however, found that despite respondent's progress, termination was appropriate. *Id*. at 3-4. At the end of the hearing, the trial court concluded:

> [T]hat on the issue of domestic violence[,] there is certainly clear and convincing evidence that the conditions that led to the adjudication continue to exist and given the amount of time that [respondent] has had, which is over ten months in this file, as well as, frankly, the demonstration of the pattern in prior terminations supports that there is no reasonable likelihood that the conditions will be rectified with any reasonable time considering the child's age.
>
> * * *
>
> The problem that I have here in a number of these areas is the credibility of [respondent] and that is further supported, okay, so

number one, if he [IV] is not around and he has to be found by discovering him hiding within the closet of [respondent's] home, there is certainly no way that we are going to be able to understand whether or not he is or is not there any other time. This court suspects very strongly that he had been there for either very frequent — either very frequently or full-time and it just happened to be once we expanded parenting time that we had that run in where he was discovered.

\* \* \*

There are also concerns under the directive to lead a substance free lifestyle and gain and exhibit an understanding of the dangers that substance abuse poses to the child which was a quote from the case services plan. Again, there was a recent, 4/14 of 2022, bi psycho social assessment wherein [respondent] self-reported that she believes her current alcohol/drug use is excessive, and that is a quote, as indicated by the case worker and the court agrees this recent self-report by [respondent] is of concern.

There is also an indication that one of the parenting times was cancelled due to self-reported illness on April 25th, 2022, associated with excessive alcohol consumption that caused her to vomit blood. So, that is clear and convincing evidence that that particular aspect of substance abuse has not been effectively treated for [respondent]. [*In re Vela*, unpub op at 3-4.]

The trial court concluded termination was in IDV's best interests because she "had a closer bond to her foster parents than to respondent," required stability and finality, was "developing well in her current environment," and there was a "high probability" she would be "adopted by the foster parents." *Id*. at 4. It therefore entered an order terminating respondent's parental rights under MCL 712A.19b(3)(c)(*i*) and (j) in mid-June 2022. *Id*.

Respondent appealed from that order. On appeal, she argued that the trial court clearly erred when it terminated her parental rights because no statutory grounds supported termination. *In re Vela*, unpub op at 5. We concluded that the record was "not clear that the trial court made sufficient findings to support termination under either statutory basis," vacated the court's termination order, remanded for it to "clarify how its order [did] not violate" *In re Plump*, 294 Mich App at 270, and retained jurisdiction. *In re Vela*, unpub op at 5-6, 9.

In reaching this conclusion, we noted that the trial court "relied on two 'main' conditions" in terminating respondent's parental rights: "(1) respondent's alcohol and drug addiction; and (2) IV's domestic violence toward respondent." *In re Vela*, unpub op at 6. Regarding the alcohol and drug addiction, we held that there was "insufficient evidence of respondent's drinking and drug use to warrant termination under MCL 712A.19b(3)(c)(*i*)" and that her alcohol and drug use was "not one of the 'main' conditions leading to adjudication." *Id*. at 7.

Instead, the main condition leading to adjudication was "respondent's continued contact with IV." *In re Vela*, unpub op at 7. The trial court repeatedly acknowledged that the "biggest barrier to reunification was respondent's relationship, and repeated domestic violence incidents, with IV . . . ." *Id*. But we concluded that the trial court had essentially terminated respondent's parental rights simply because she was a domestic violence victim in contact with her abuser, a finding contrary to this Court's holding in *In re Plump*, 294 Mich App at 273. *In re Vela*, unpub op at 8. We also noted there was "no evidence of harm to IDV or that respondent was an abuser," acknowledging, however, that the possibility of circumstances where such a harm may exist must be more than speculative. *Id*., citing *In re Plump*, 294 Mich App at 273. Because we concluded that the trial court's "order finding statutory grounds to terminate respondent's parental rights under MCL 712A.19b(3)(c)(*i*) does not clearly state the non-speculative harm to IDV or other bases for terminating beyond respondent's victimhood," we vacated the order and remanded for the court to clarify. *In re Vela*, unpub op at 8.

We also vacated the trial court's findings related to MCL 712A.19b(3)(j) and remanded for clarification, concluding that the court "may have impermissibly relied on respondent's victimhood" in finding this statutory ground satisfied. *In re Vela*, unpub op at 8. Though there was a pattern of harm by IV against respondent, we noted there was no evidence that IV had harmed IDV since her birth. *Id*. at 9. And although the record supported a finding that IV harmed respondent while she was pregnant with IDV, we concluded "the trial court did not explain, and the record largely does not support, its conclusion that there was a reasonable likelihood of harm against IDV, instead of just against respondent." *Id*. Accordingly, we concluded that the trial court's termination order did "not clarify the evidence supporting its speculation that IV's violence toward respondent makes it likely that IV will be violent toward IDV," vacated the order, and "remand[ed] for that clarification." *Id*.

## B. HEARINGS ON REMAND AND TRIAL COURT'S TERMINATION OF PARENTAL RIGHTS

Following remand, the trial court held an evidentiary hearing over the course of two days in mid-January 2023. The trial court heard testimony from Brenee Moore, a clinical therapist and the individual who prepared the April 2022 biopsychosocial assessment previously relied on by the trial court, and Blissfield Police Officer David Luce, a police officer who responded to a late July 2022 domestic violence incident between respondent and IV. It also heard from respondent herself, and Ashley Beach, a foster care worker.

Moore testified first, focusing much of her testimony on describing the cycle of domestic violence and explaining where respondent's behavior fit in that cycle. Important here, Moore stated:

> So, domestic violence can be seen in a cycle. You have the honeymoon phase and you have your build up and then you have the incident and then you go through and you keep doing that. So when we feel anxious we kind of poke the bear . . . to get it done and over with so we can get back to the honeymoon phase. So the resistive violence is a partner comes home from work and slams the door. The slamming the door is a trigger so you have a trauma response. The door slammed so you know that something is going to happen so instead of kind of

staying under the radar they go towards them and get the violence over with. They go towards them to say something and might poke them in the chest, they might push them so then they get hit and then they can go back to the honeymoon phase after the violence.

Moore indicated there was a "fine line" between self-defense and actively participating in the cycle of domestic violence. She explained that "if somebody comes up and hits you and then you retaliate, that is violence. If you are protecting yourself, but then while" doing so "you become violent in return and keep going . . . there is a fine line between self-defense and retaliating then becoming domestically violent yourself." According to Moore, respondent was "[b]oth a victim and perpetrator, and, after three sessions, she found respondent's prognosis to be "poor."

Regarding the effect of domestic violence on children, Moore testified that whether they actually observed the violence was immaterial. According to Moore, it still "impacts the children because it creates tension in the home which children will feel." For example, Moore indicated that children, even at a young age, can feel tension and other emotions of a person. This constitutes "secondary trauma." As opposed to "primary trauma," where "the person directly experiences it, like the parent," secondary trauma occurs when "the child feels the emotions of a parent or sees injuries as a result of it that could cause trauma based on that secondary, not directly to them, but secondary."

Officer Luce testified about a late July 2022 incident—approximately 1½ months after the initial termination hearing—between respondent and IV at respondent's apartment. According to Officer Luce, respondent reported to him that IV was at her apartment with several individuals. Respondent was not there, but, according to her report to Officer Luce, IV asked her to return to "bring some money for his friends for gas money." Respondent returned and asked everyone to leave. They complied, but IV remained in the apartment. "Shortly thereafter[,] they got into an altercation." Officer Luce testified that, as respondent reported, IV slapped respondent, she "chased him out of the apartment" to the parking lot, and she called 911. IV, on the other hand, reported to Officer Luce that respondent "assaulted him with a tire iron at that point" and that he "may have struck her" as he left the apartment to "get away from her."

Relevant to our purposes, respondent testified about the July 2022 incident with IV. She testified that although she "could have been a lot less aggressive towards" the situation, but she "did not start [it]." Respondent acknowledged, however, that she had indicated in her psychological evaluation and assessment with Moore that she was an aggressor in her relationship with IV. She also believed that her relationship with IV, and their behavior, was harmful to IDV, stating that "even if she wasn't physically abused, I feel like she could tell."

Respondent testified that she ended her relationship with IV before the July 2022 incident. She had, however, started dating someone new in September 2022. Respondent then described an incident with her new boyfriend during which he became aggressive and upset that she was sleeping and not picking up after him. The incident involved him pushing her against a wall, trying to break phone and debit card, and culminated in him firing a gun into the air or toward the ground as respondent drove away in a friend's vehicle. As of the mid-January 2023 evidentiary hearings, respondent was pregnant with this individual's child.

Respondent also acknowledged a mid-June 2022 incident with IV—just a few days before the original termination hearing. That incident involved IV allegedly taking $80 from respondent's vehicle. Respondent confirmed that she confronted IV while holding a baseball bat to confront IV. When asked the purpose of the bat, respondent testified: "Because I know how [IV] is and if anything were to go wrong that is something that I would use to protect myself." She denied having to use the bat that day.

Beach testified that the primary concern in this case was domestic violence and indicated there were frequent discussions with respondent about the "very concerning" nature of her relationship with IV. Beach testified IDV would be harmed if exposed to IV's violence and was concerned by questions of whether IV was present in respondent's home. She also noted that respondent had admitted to being an aggressor in her relationship with IV, stressing that respondent was not just a victim. Specifically, Beach stated: "I just would like to make clear that [respondent] was just not solely the victim of domestic violence. She demonstrated patterns of engaging and participating in patterns of violent behavior and criminality and that was demonstrated throughout the foster care case and is ongoing today." Beach testified that respondent did not benefit from the services provided, having failed to "break the patterns of engaging in violent behaviors with partners . . . ."

After closing arguments, the trial court acknowledged that respondent "care[d] for her children" and had made "significant progress" with her substance abuse issues. It found, however, that respondent was an "active participant" in the cycle of domestic violence, not just a victim. The trial court found the record to be "replete with instances" documenting respondent's failure to benefit from services, and that respondent's denial and "ability to re-paint" the events of her case were "major barrier[s]" to progress. The trial court also noted respondent's failure to complete domestic violence services with Moore. It further expressed concerns about respondent exposing IDV to incidents of violence that could "very eas[ily] perpetuate the cycle" and "create new norms for that child" that would imprint on her "as a young person and as an adult[,] which is exactly what we want to avoid." The court considered this "a significant risk of harm." The trial court also found there was a risk of physical and mental harm to IDV because of respondent's failure to benefit from services, and it would not be reasonable to make IDV wait even longer for respondent to progress. The court stressed the importance of stability, permanence, and "[IDV's] need to move forward," noting respondent's testimony "recognizing that the patterns that were happening in the home" with IV were "stressful and [were] harmful to" IDV's mental health.

The trial court therefore found clear and convincing evidence that there was a risk of harm "associated with returning" IDV to respondent's care "as a result of an unbroken cycle of domestic violence" that harmed IDV's mental health and respondent's physical and mental health. The court found that the record was "replete" with evidence supporting its initial findings and that "termination [was] appropriate," concluding respondent did not "benefit from services around the area of avoiding domestic violence" and failed to "avoid[] participating in the cycle of domestic violence which would be harmful to the child." It therefore entered a termination order, stating that its earlier June 2022 termination order "stands as written for [the] reasons set forth on the record."

Respondent appealed as of right from the late January 2023 order terminating her parental rights. But because we retained jurisdiction in Docket No. 362200, we consolidated the two cases

and required simultaneous briefing. *In re Vela*, unpublished order of the Court of Appeals, entered February 24, 2023 (Docket Nos. 362200, 364920).

## II. STANDARDS OF REVIEW

We review for clear error the trial court's decision that statutory grounds for termination have been proven by clear and convincing evidence, as well as its determination that termination is in a child's best interests. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "A trial court's decision is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id*. We give "deference to a trial court's special opportunity to judge the weight of the evidence and the credibility of the witnesses who appear before it." *In re TK*, 306 Mich App 698, 710; 859 NW2d 208 (2014).

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App at 40. "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013).

## III. STATUTORY GROUNDS

Respondent asserts that although the trial court found that she was a "participant" in the domestic violence cycle, it did not find that she perpetrated domestic violence. She reincorporated her arguments from her appeal in Docket No. 362200 to argue that the trial court's decision to terminate her parental rights was clearly erroneous. We disagree.

A court may terminate parental rights under MCL 712A.19b(3)(c)(*i*) or (j) if it finds clear and convincing evidence of the following:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> * * *

> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

Termination is appropriate under MCL 712A.19b(c)(*i*) when the "totality of the evidence" supports a finding that the respondent-parent did not "accomplish[] any meaningful change in the conditions" that led to the adjudication. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009). The court must also find that "there is no reasonable likelihood that the conditions will be

rectified within a reasonable time considering the child's age." MCL 712A.19b(3)(c)(*i*). What constitutes a "reasonable time" requires consideration of how long the parent will take to improve the conditions and how long the children can wait for the improvements to occur. See *In re Dahms*, 187 Mich App 644, 648; 468 NW2d 315 (1991). With respect to MCL 712A.19b(3)(j), we noted previously that there must be more than conjecture to show a reasonable likelihood that the child will be harmed if returned to a respondent's home. See *In re Sours*, 459 Mich 624, 635-636; 593 NW2d 520 (1999) (declining to affirm termination where finding of reasonable likelihood of harm was "essentially conjecture").

We remanded for the trial court to address solely whether its decision to terminate respondent's parental rights complied with the mandates in *Plump* and *In re Jackisch/Stamm-Jackisch*, 340 Mich App 326; 985 NW2d 912 (2022). We limit our review to that issue and conclude that the trial court did not clearly err by finding that clear and convincing evidence supported termination of respondent's parental rights.

As we previously stated, though it is impermissible to terminate a respondent's parental rights "solely because he or she was a victim of domestic violence," termination is permissible when a "respondent's own behaviors [are] directly harming the children or exposing them to harm." *In re Plump*, 294 Mich App at 273. On remand, the evidence established that respondent was not simply a victim of domestic violence—she also participated in and committed it. Moore and Beach testified that although respondent was a victim of domestic violence, she was also a perpetrator of it. Respondent acknowledged having reported in her psychological evaluation and assessment with Moore that she was an aggressor of domestic violence in her relationship with IV. Respondent also testified about an incident just a few days before the original termination hearing in June 2022, in which she wielded a baseball bat while confronting IV after he allegedly took $80 from her vehicle. In explaining the purpose of the baseball bat, respondent stated that she "kn[e]w how [IV] [was] and if anything were to go wrong that is something that I would use to protect myself." Moore testified that there was a "fine line" between self-defense and actively participating in the cycle of domestic violence," and that going beyond self-defense by retaliating with a weapon constituted domestic violence. Officer Luce also testified about a late July 2022 incident between respondent and IV, which was not part of the record in the prior appeal. Although respondent reported to Officer Luce that IV slapped her and she "chased him out of the apartment," IV, according to Officer Luce, reported that respondent had "assaulted him with a tire iron" and he "may have struck her" as he tried to "get away from her." Respondent also failed to benefit from domestic violence services offered to her throughout her case. Beach testified to this effect, expressing her concern that respondent failed to "break the patterns of engaging in violent behavior with partners," despite that being stressed to her as a primary concern. She also noted respondent's failure to comply with were safety plan, which required her to keep "unsafe" individuals away from IDV. This evidence supported the trial court's finding that respondent had not resolved her domestic violence issues that led to adjudication. We are satisfied that termination of respondent's parental rights was compliant with the demands of *Plump* and *Jackisch*.

The evidence also showed that respondent's actions exposed IDV to a risk of harm. There was no evidence IDV was exposed to domestic violence or the subject of any such abuse. But there was testimony at the hearings on remand establishing that she was exposed to the tension of the relationship between respondent and IV, and that it had an effect on her. Moore testified that domestic violence impacts children, even if they do not observe it firsthand, "because it creates

tension in the home which the children will feel." This, according to Moore, constitutes secondary trauma; the child feels the parent's emotions or sees injuries stemming from domestic violence and it secondarily affects the child. Respondent herself admitted that her relationship with IV, and their behavior toward one another, was harmful to IDV. She stated that "even if [IDV] wasn't physically abused, I feel like she could tell."[2] This is more than conjecture. This testimony demonstrates that respondent's conduct was having a harmful effect on IDV and supports the trial court's finding that it was affecting IDV's mental health. Considering the testimony on remand and additional findings of the trial court, we conclude that the trial court did not clearly err in terminating respondent's parental rights under MCL 712A.19b(3)(c)(*i*) or (j). See *In re Plump*, 294 Mich App at 273 (finding termination permissible when a "respondent's own behaviors [are] directly harming the children or exposing them to harm.").

## IV. BEST INTERESTS

We did not previously address whether the trial court clearly erred in finding that termination was in IDV's best interests. We do so now and conclude that it did not.

In termination proceedings, the trial court must weigh all the evidence, within the entire record, to determine the children's best interests. See *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000); *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). "The focus at the best-interest stage has always been on the child, not the parent." *In re Payne/Pumphrey/Fortson Minors*, 311 Mich App 49, 63; 874 NW2d 205 (2015) (quotation marks, citation, and brackets omitted). "To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re White*, 303 Mich App at 713 (quotation marks omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id*. at 714. The trial court must state on the record or in writing its findings of fact and conclusions of law regarding its best-interest determination. See MCL 712A.19b(1); MCR 3.977(I)(1).

At the initial termination hearing, the trial court found that a parent-child bond existed between respondent and IDV. But the court found that the bond between IDV and her placement was stronger mainly because of setbacks in respondent's case. The court concluded that IDV's "age and need for permanence [were] paramount," and that she needed to "be able to continue to successfully progress" in her placement and meet "developmental milestones . . . ." It also noted the "high likelihood" that IDV would be adopted, that although IDV was "too young to express her own preference," she shared a bond with her foster family, demonstrating that she was "well

---

[2] In our previous opinion, we noted that when respondent's parenting time was returned to supervised visitation after the discovery of IV in a closet at respondent's residence, IDV's "mood improved, she started sleeping th[r]ough the night, and she stopped getting diaper rashes." *In re Vela*, unpub op at 3.

adjusted in that environment and has benefited from that," and that she could "continue to enjoy her siblings thanks to the placement."

At the remand hearing, the trial court focused on the negative impact domestic violence had on IDV, and would continue to have if returned to respondent's care, and the risk of harm stemming from respondent's failure to benefit from services. The court further concluded it was "not reasonable" to make IDV "wait to work toward reunification again considering" the time respondent "already had to take advantage of services." As at the initial termination, the trial court reiterated the importance of stability, permanence, and IDV's need to move forward. Supporting this position, it pointed to respondent's recognition that her home environment and interactions with IV were harmful to IDV. The trial court concluded respondent would not make progress in a reasonable time such that it would be in IDV's best interest to give respondent the opportunity to do so.

The trial court did not clearly err when it found that termination was in IDV's best interests. Beach testified at the initial termination hearing that respondent had been provided several years of services to address her domestic violence issues and failed to progress. She also described the bond between IDV and her foster parents as that of "a primary caregiver parent/child type of bond," and indicated that IDV visited her maternal half-siblings "at least monthly," visits that would continue if IDV were adopted. Beach noted that IDV had been placed with her foster parents for approximately 13 months at the time of the termination hearing, having been with them since she was two days old. She also indicated that IDV's needs were being met by the foster parents and they were willing to provide permanency for IDV. As indicated earlier, the testimony of Moore, Beach, and respondent herself at the evidentiary hearings on remand demonstrated that respondent perpetrated acts of domestic violence and was not simply a victim. It also established respondent had not benefited from her domestic violence services and that the domestic violence had a negative impact on IDV. Accordingly, the trial court did not clearly err in finding that clear and convincing evidence supported a finding that termination was in IDV's best interests.

We affirm.

/s/ Noah P. Hood
/s/ Brock A. Swartzle
/s/ James Robert Redford

-11-